[Cite as *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 2011-Ohio-4466.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### ALLEN COUNTY

OSEI-TUTU OWUSU, M.D.,

    PLAINTIFF-APPELLEE,               CASE NO. 1-10-81

    v.

HOPE CANCER CENTER OF
NORTHWEST OHIO, INC., ET AL.,        O P I N I O N

    DEFENDANTS-APPELLANTS.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2010 0029

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision:   September 6, 2011

APPEARANCES:

   *Michael G. Sanderson*  for Appellants

   *David A. Rodabaugh*  for Appellee

**WILLAMOWSKI, J**.

{¶1} Defendants-Appellants, Hope Cancer Center of Northwest Ohio, Inc., et al. ("HCC"), appeals the judgment of the Allen County Court of Common Pleas finding that the covenant not to compete in HCC's employment agreement with Plaintiff-Appellee, Osei-Tutu Owusu, M.D. ("Dr. Owusu" or "Employee") was unreasonable and unenforceable. On appeal, HCC contends that the trial court erred in finding that the employment agreement was unenforceable; that it improperly applied the standards for enforcement of a covenant not to compete; and that it erred in its interpretation of the bonus provisions of the employment contract. For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} HCC has been in business in Lima, Ohio, since 2003, with a satellite office in Van Wert. The practice is limited exclusively to the subspecialty of oncology and hematology. In mid-2008, Dr. Ravi Madan ("Dr. Madan"), HCC's president and sole shareholder, hired a physician recruiter, Bill Brochetti ("Mr. Brochetti"), to locate an additional oncologist/hematologist to work for HCC. Dr. Madan and Mr. Brochetti engaged in negotiations with Dr. Owusu, a physician from the Cleveland area, concerning the potential terms of his employment with HCC.

{¶3} On November 12, 2008, Dr. Owusu entered into an Employment Agreement ("Agreement"), signed by both Dr. Owusu and Dr. Madan. The initial term of the Agreement began November 17, 2008 (when Dr. Owusu began working for HCC) and continued until December 31, 2009 (the "Term"). The Agreement would automatically renew for one additional year unless it was terminated per the specified terms of the Agreement. HCC could terminate the Agreement during the initial Term either for "Cause" or by giving 90 days written notice to Dr. Owusu. Either party could "terminate th[e] Agreement upon 90 days written notice after the initial Term." (Ex. 1, Sections 2 and 13.)

{¶4} The Agreement and its four addenda provided for the terms and conditions of employment and provided that Dr. Owusu would receive a base salary of $325,000 for his first year of employment, plus a bonus based upon the amount of gross collections. The base salary was to increase to $350,000 during the following year. The parties also negotiated back and forth over the terms of the Agreement's covenant not to compete. Dr. Owusu rejected and refused to agree to any specific mileage restriction in the non-compete terms of the Agreement. The final version of "Section 14. Noncompetition" (the "Non-Compete Clause") in the signed Agreement stated:

**14.1 Throughout the Term and for two (2) years after expiration or termination of this Agreement by either party, with or without cause, Employee may not directly or indirectly:**

**14.1.1 engage in any capacity in or have any financial interest in any medical practice specializing in hematology or oncology in the primary service area of Lima, Ohio and the primary service area of Van Wert, Ohio.**

**14.1.2 contact any patients of Hope or otherwise attempt to establish a referral base through such patients; or**

**14.1.3 contact any employee or offer employment to any individual who was employed by Hope at any time within two (2) years prior to the date of termination of Employee's employment. * * ***

**{¶5}** Problems arose during the first Term of employment and Dr. Owusu decided that he did not wish to continue working for HCC. He learned that Dr. Madan's medical license had been suspended by the State Medical Board of Ohio and that HCC was being investigated for several other matters. In early 2009, the other oncologist, Dr. Greene, left HCC, leaving Dr. Owusu as the only licensed physician to handle all of the patients at HCC. In the summer of 2009, Dr. Owusu attempted to give ninety days' notice of termination, stating that he would be resigning from HCC, effective November 17, 2009. However, HCC would not accept his resignation, stating that he had "no right to terminate the contract until

December 31, 2009 upon ninety days' notice, making the earliest possible termination date March 31, 2010."[1] (Ex. 23.)

{¶6} Dr. Owusu complied, and worked through the "notice period" until March 31, 2010. Thereafter, he wanted to continue working in the Lima area, either for another oncology group or by opening his own oncology practice. He planned to work at a location approximately two miles from HCC, but potential employers expressed concern about the Non-Compete Clause in the Agreement.

{¶7} Therefore, in January 2010, Dr. Owusu filed a complaint for declaratory judgment and preliminary injunction.[2] He asked the trial court to find that the Non-Compete Clause in the Agreement was unenforceable and invalid. Dr. Owusu claimed that he had been led to believe that the geographic restrictions in the Non-Compete Clause had been removed. He further alleged that he had entered into the Agreement based upon misrepresentations as to Dr. Madan's board certification and the status of his medical license suspension.[3] In May 2010, Dr. Owusu filed an amended complaint, alleging additional matters concerning the

---

[1] We understand and agree that Dr. Owusu was obligated to work until the end of the first Term, December 31, 2009, rather than leave on November 17, 2009. However, we fail to see why he could not have given ninety days' notice prior to the end of the Term, so that his last date of employment would be December 31, 2009, the ending date of the first Term. HCC's actions forced Dr. Owusu to work an additional three months beyond what he had contemplated. Per HCC's interpretation of the Agreement, it would have been impossible for Dr. Owusu to work for only the initial Term and leave on December 31, 2009.

[2] The matter of an injunction was never pursued.

[3] Dr. Madan's license was suspended in mid-2008, and was still under suspension at the time of the trial in October of 2010.

Non-Compete Clause and Dr. Madan's eligibility to legally operate a medical center while his license was under suspension. Dr. Owusu also claimed that HCC owed him an additional $150,000 pursuant to the parties' bonus agreement.

{¶8} HCC filed a motion for summary judgment on six of Dr. Owusu's seven claims. On July 6, 2010, the trial court filed its judgment entry granting summary judgment in part and denying it in part. The trial court found genuine issues of material fact existed as to the reasonableness of the covenant not to compete, specifically as to the "primary service area," and whether statements made by Dr. Madan concerning his medical license fraudulently induced Dr. Owusu into entering into the Employment Agreement. The issue concerning the bonus was not a part of the summary judgment and also remained to be decided.

{¶9} A two-day bench trial was held on the three remaining issues in October of 2010. After hearing the testimony of the parties and several other witnesses, the trial court filed a lengthy judgment entry on November 12, 2010. The trial court did not find any merit in Dr. Owusu's claims for misrepresentation and fraudulent inducement. However, it did find that section 14.1.1 of the Non-Compete Clause was unenforceable and void as a matter of law. The remaining sections of the Non-Compete Clause remained viable and Dr. Owusu was prohibited from soliciting any of HCC's employees or former patients during the

two-year time period. The trial court further found that HCC owed Dr. Owusu an additional $100,000 for his bonus earnings.

{¶10} It is from this judgment that HCC appeals, raising the following three assignments of error for our review.

### First Assignment of Error

**The trial court erred as a matter of law in holding the covenant not to compete too indefinite and unenforceable.**

### Second Assignment of Error

**The trial court abused its discretion in its application of the *Raimonde* standards for enforcement of a covenant not to compete.**

### Third Assignment of Error

**The trial court erred in its interpretation of the bonus provisions of the contract.**

{¶11} All three assignments of error involve the application of basic contract law to the interpretation of the Employment Agreement. The construction of written contracts is a matter of law. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 1996-Ohio-393, 667 N.E.2d 949; *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus. "Unlike determinations of fact which are given great deference, questions of law

are reviewed by a court de novo*." Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 1995-Ohio-214, 652 N.E.2d 684, 686.

{¶12} The purpose of contract construction is to discover and effectuate the intent of the parties, as that intent is evidenced by the contractual language. *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language they chose to use in their agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus. Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28, 597 N.E.2d 499, 501. A contract is generally to be construed against the party who drafted it. *Cent. Realty Co. v. Clutter* (1980), 62 Ohio St.2d 411, 406 N.E.2d 515.

*First and Second Assignments of Error – Non-Compete Clause*

{¶13} The first two assignments of error both pertain to the validity and enforceability of the Non-Compete Clause. HCC originally proposed that the restricted geographical area should encompass a 35-mile radius. Dr. Owusu rejected this and did not want to have any mileage restriction or covenant not to

compete, whatsoever. Although HCC agreed to remove a specific mileage radius, Dr. Owusu was told that "there was going to be some form of a covenant in there." (Tr., p. 199.) Dr. Madan and others testified about how the practice of oncology was almost exclusively dependent upon physician referrals and why it was important for HCC to protect the local physician referral network that it relied upon to provide its patients. If Dr. Owusu opened a practice in Lima, as he was planning to do, he would be utilizing this same physician referral network and taking patients and business away from HCC's practice.

{¶14} Dr. Owusu acknowledged that he was aware that the Agreement he signed contained a Non-Compete Clause referring to the "primary service area," but claimed he did not understand what that meant and argued that it was vague and unenforceable. Dr. Madan testified that the "primary service area" was a term commonly used in the healthcare industry, and that it could easily be ascertained by using patient zip codes to statistically determine what was the geographic area from which a hospital or practice drew the majority of its patients. Testimony and exhibits were provided showing the percentages of patients that came from within certain areas that constituted HCC's claimed primary service area.

{¶15} The trial court held that the language of "primary service area" was too indefinite and uncertain to be enforceable, based partly on testimony from Dr.

Madan and Dr. Owusu that they did not know specifically what geographical area that terminology encompassed at the time they signed the Agreement. However, Dr. Madan testified that there was no reason to do the statistical analysis to define the exact limitations of the primary service area at the time the Agreement was drafted; the primary service area was specified in order to protect HCC's interests and it was a term that was easily ascertainable if the need should arise. However, the trial court concluded that this clause merely constituted "an agreement to make an agreement in the future," and therefore, was not an enforceable contract (citing to *Joseph dba Chapman Motor Rebuilders v. Doraty* (1957), 144 N.E.2d 111, 77 Ohio Law Abs. 381.

{¶16} On appeal, HCC contends that the trial court misapplied contractual legal standards and failed to take into account more current, contrary Ohio authority. He argues that the lack of a specific definition for this phrase did not make the contract void or indefinite; it merely required the trial court to use the rules of construction to determine what would be a reasonable meaning for the phrase. HCC further asserts that the phrase "primary service area" is well-known industry terminology and can be easily ascertained and defined.

{¶17} We agree with HCC that the current dispute should not be over whether there was a contract with a valid covenant not to compete, but should only

involve the determination of the meaning of the phrase "primary service area." Lack of a specific definition for this phrase did not make the contract void or indefinite but merely required the trial court to use rules of construction to determine what would be a reasonable meaning for the terminology. "A dispute over the meaning of a term does not constitute an absence of a material term that could defeat the enforceability of the contract." *Allen v. Bennett*, 9th Dist. Nos. 23570, 23573, 23576, 2007-Ohio-5411, ¶14. There are numerous examples of cases where a contract contained an industry "term-of-art" that may not have been defined in the agreement, but could easily be construed based upon industry standards and common usages. See, e.g., *Ameritech Publishing, Inc. v. Snyder Tire Wintersville, Inc.*, 7th Dist. No. 09 JE 35, 2010-Ohio-4868, ¶36 (construing the phrase "prevailing rates"); *Allen v. Bennett*, 2007-Ohio-5411 at ¶14 (construing the phrase "commercially reasonable form"). The Ohio Supreme Court has held that the lack of a specific definition for an ascertainable contract term ("ordinary industry prices") does not negate the parties' intention to form a contract at that time and it does not invalidate the contract.

> **If it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result. 1 Corbin on Contracts, 400 to 406, Section 95; 1 Williston on Contracts (3 Ed.), 110 and 111, Section 37. Even though [the defendant's] purported acceptance stated the price**

> **for [the plaintiff's] services was 'to be determined,' this does not indicate a mere 'agreement to agree' as to an essential term of the contract. * * * Rather, it merely refers to [the plaintiff's] offer to do the work for 'ordinary industry prices,' a way of filling in a blank on its purchase order in the absence of a specified liquidated amount. Further, the term, 'ordinary industry prices,' sets a standard ascertainable by proof, which would permit enforcement of the parties' express contract.**

*Litsinger Sign Co. v. American Sign Co.* (1967), 11 Ohio St.2d 1, 14, 227 N.E.2d 609.

{**¶18**} HCC presented a considerable amount of evidence to demonstrate that "primary service area" was a term-of-art common to the medical industry, and presented a statistical analysis as to what it considered HCC's primary service area to include. The Ohio Administrative Code requires information concerning "[t]he current and proposed *primary and secondary service areas* and their corresponding population" when considering granting "certificates of need" relative to increasing or altering the number of beds for healthcare facilities. (Emphasis added.) Ohio Adm.Code 3701-12-20(E)(1); *In re Application of Manor Care of Parma*, 10th Dist. Nos. 05AP-398, 05AP-408, 2005-Ohio-5703, ¶30 ("they further noted 279 vacant beds in the primary service area ('PSA'), and 24 vacant beds in the secondary service area ('SSA')"); *In re Certificate of Need Application of Providence Hosp.* (1990), 67 Ohio App.3d 391, 587 N.E.2d 326 (appellee argued that its trade service area coincided with its "Primary Service

Area," an eleven zip code area north and west of downtown Cincinnati); *In re Certificate of Need Application for Parkside Villa*, 10th Dist. No. 04AP-1232, 2005-Ohio-5699, ¶¶30-31 (discussing the reasonableness of the defined primary and secondary service areas). There are even more examples of various cases discussing the "primary service area" or "PSA" in various types of Federal cases. See, e.g., *Gordon v. Lewistown Hosp.* (C.A.3, 2005), 423 F.3d 184; *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.* (C.A.5, 1997), 123 F.3d 301; *F.T.C. v. ProMedica Health System, Inc.*, (N.D.Ohio 2011), 2011 WL 1219281.

{¶19} The language of a contract "is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶11. It is clear that the boundaries of HCC's "primary service area" could have been given a definitive meaning. The trial court should have determined the meaning and the extent of the primary service area instead of invalidating a key portion of the Non-Compete Clause.

{¶20} Although Dr. Owusu may not have wanted to be bound by non-compete restrictions, he knowingly signed an Employment Agreement that contained a covenant not to compete that prohibited him from engaging in a hematology or oncology practice within the primary service area of HCC's two

offices. While "primary service area" may not have been specifically defined in the Agreement, it is a common term-of-art that is used in the medical profession and can be statistically ascertained. The *exact outer boundaries* of HCC's primary service area may be arguable and subject to interpretation, but we do not believe that any finder of fact could reasonably conclude that an oncology practice within two miles of HCC's main office was not within HCC's primary service area and in violation of the Non-Compete Clause.

{¶21} The trial court erred when it found that the Non-Compete Clause was rendered void merely because the parties used the phrase "primary service area" to describe the geographical limitations of the non-compete area. HCC's first assignment of error is sustained.

{¶22} In its second assignment of error, HCC claims that the trial court misapplied the standards used to determine whether a covenant not to compete is enforceable. HCC specifically believes that the trial court erred in applying the three factors set forth in *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 325 N.E.2d 544. We review a trial court's determination of a declaratory-judgment action for an abuse of discretion, independently and without deference to the trial court's decision. *Mid-Am. Fire & Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-

Ohio-1248, 863 N.E.2d 142, ¶12-14; *Homan, Inc. v. A1 AG Servs., L.L.C.*, 175 Ohio App.3d 51, 2008-Ohio-277, 885 N.E.2d 253, ¶7.

{¶23} Covenants not to compete pertaining to physicians are not per se unenforceable pursuant to American Medical Association's principles of medical ethics or interpretations of those principles. See, e.g., *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 594 N.E.2d 1027; *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health* (1997), 124 Ohio App.3d 308, 314-15, 706 N.E.2d 336. Although the law does not favor such restrictive covenants, they will be upheld if they are reasonable. *Ohio Urology* at 453; *Clark* at 313.

{¶24} In Ohio, the applicable rule of reason regarding covenants not to compete was stated in *Raimonde v. Van Vlerah*, supra, wherein the Supreme Court of Ohio held that a covenant not to compete is enforceable "if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." Id. at paragraph two of the syllabus; *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶¶23-24 (reaffirming the holdings in paragraphs one and two of *Raimonde*). This rule is to be applied on a case-by-case basis, with each case being decided on its own facts. *Raimonde* at 25, 325 N.E.2d at 547. We find that the facts before the trial court clearly established that:

(1) HCC had a legitimate business interest to protect, and the covenant was reasonably limited in its scope to protect this interest; (2) the restraint did not unduly harm Dr. Owusu; and, (3) the covenant was not injurious to the public.

{¶25} The practice of oncology is a "referral-based specialty." (Tr., p. 23). When Dr. Owusu started at HCC, he had no contacts or referral base in the area. During the sixteen months he worked for HCC, he developed physician referral connections as a result of his employment with HCC that he would like to utilize to build a new practice. This is specifically the business interest that HCC sought to protect with its Non-Compete Clause. In upholding covenants not to compete for such purposes, the Sixth District Court of Appeals stated:

> **It would eviscerate entirely the protection of restrictive covenants to allow a physician to practice, contrary to the restrictive covenant, after [the physician's] employment enabled [the physician] to establish the very contacts which would allow [the physician] to destroy a practice that was established before [the physician's] employment.**

*Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 332, 666 N.E.2d 235.

{¶26} The trial court also erred in finding that HCC did not have any legitimate business interest to protect because of Dr. Madan's license suspension. Even though Dr. Madan cannot personally treat patients, he still owns and operates

the business. Additional physicians have been hired by the practice since Dr. Owusu left, and HCC is entitled to protect its referral base.

{¶27} Furthermore, we find that the Non-Compete clause was reasonably limited to only two years and to only HCC's primary service area. Similar narrow restrictions have been held to be reasonable and enforceable by other courts. See, e.g., *Wall* (restrictive covenant which prevented plaintiff from competing with corporation for period of up to three years within a 20-mile radius of corporation's offices and two hospitals was enforceable).

{¶28} Next, we find that the evidence demonstrated that the enforcement of the covenant would not unduly harm Dr. Owusu, who was working in Findlay, Ohio, for a practice owned by his wife, who was also a physician. Dr. Owusu also worked in Lima as a part-time emergency room physician, which was permitted under the terms of the Agreement because it did not involve the fields of oncology or hematology. Although he testified that his income had decreased since he left HCC, it was Dr. Owusu's choice to terminate his employment. The evidence showed HCC very much wanted Dr. Owusu to remain and had even made him a partnership offer. Dr. Owusu was not from the Lima area and had no connections with this area prior to his employment with HCC. He had previously worked in Cleveland, Ohio, and had another job offer in that area at the time he accepted

employment with HCC. In fact, his wife and family still maintain their home in the Cleveland area. There was testimony that there was an increased need for oncologists as the population ages, and there was no evidence at all that Dr. Owusu would not be able to find suitable employment elsewhere if he was precluded from working in Lima for two years. Furthermore, he was aware of this restriction when he accepted the position with HCC and signed the Agreement.

{¶29} And finally, the covenant was not injurious to the public. Although the trial court found that "a patient should be able to choose his or her own physician" (J.E. p. 27, ¶31), Ohio courts have repeatedly rejected the argument that covenants are not enforceable against physicians solely because it impairs the patient's choice. See, e.g., *Ohio Urology*, supra; *Gen. Medicine, P.C. v. Manolache*, 8th Dist. No. 88809, 2007-Ohio-4169, ¶12. The enforcement of the covenant against Dr. Owusu did not bar patients from his services but only limited the physical location of his office.

{¶30} Also, several witnesses testified that there was no shortage of oncologists in the Lima area to service the public, including the physician recruiter. There are at least six to eight oncologists in the Lima area and this was said to be more than sufficient to handle the area's needs. Dr. Madan and others testified that HCC, as well as other oncology practices in this area, had to maintain

satellite offices because there were not enough patients the area to sustain a practice based solely in Lima. There was further testimony that covenants not to compete were very common in physician contracts, and there was nothing in the evidence to demonstrate that the public would be harmed by this particular covenant.

{¶31} Based on the above, we find that the Non-Compete Clause in Dr. Owusu's Agreement meets all of the *Raimonde* factors for enforceability. The trial court abused its discretion when it misapplied the facts in the record to the law. HCC's second assignment of error is sustained.

*Third Assignment of Error – Calculation of Bonus Provision*

{¶32} In the third assignment of error, HCC claims that the trial court erred in its interpretation of the bonus provisions of the contract. HCC contends that it owed Dr. Owusu a maximum bonus of $100,000 for the full year that he worked in 2009, and that it did not owe him any bonus for the six weeks he worked in 2008 or for the three months he worked in 2010. In contrast, Dr. Owusu argues that he should have been paid bonuses of $50,000 for 2008, $200,000 for 2009, and $50,000 for 2010, for a total of $300,000.

{¶33} The parties agree that HCC already paid Dr. Owusu $150,000, so he contends that he is entitled to an additional $150,000. HCC claims that Dr. Owusu

was only entitled to a $100,000 bonus maximum (HCC maintains that it only paid him the extra $50,000 to encourage him to stay so that HCC would not be without a licensed physician.) The trial court awarded Dr. Owusu an additional $100,000, finding that he was entitled to a bonus of $200,000 for 2009, $50,000 for 2010, and no bonus for 2008.

{¶34} The parties' disparate calculations are based upon very different versions as to what the wording in the Bonus Calculation Addendum ("Bonus Addendum" or "Addendum") means and how it should be interpreted. "Contractual language is ambiguous only if its meaning cannot be determined from the four corners of the agreement, or if the language is susceptible of two or more *reasonable* interpretations." *Dunson v. Home-Owners Ins. Co*., 3d Dist. No. 5-09-37, 2010-Ohio-1928, ¶27; *Covington v. Lucia*, 151 Ohio App.3d 409, 2003-Ohio-346, 784 N.E.2d 186, ¶18.

{¶35} In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923. However, where that cannot be determined, it has long been held that where there is doubt or ambiguity in the language of a contract, it will be construed strictly against the party who prepared it. *McKay Mach. Co. v. Rodman* (1967), 11 Ohio

St.2d 77, 80, 228 N.E.2d 304. See, also, *Graham v. Drydock Coal Co.*, 76 Ohio St.3d at 314, 667 N.E.2d 949. "In other words, he who speaks must speak plainly or the other party may explain to his own advantage." *McKay* at 80. HCC's agent, Mr. Brochetti, drafted the Bonus Addendum after communicating back and forth with Dr. Madan and Dr. Owusu, and it was reviewed by Dr. Madan before submitting it to Dr. Owusu.

{¶36} HCC, however, argues that the rule construing contracts against the drafter should be limited to adhesion contracts where the parties lack equal bargaining power, citing to this Court's decision in *Cline v. Rose* (1994), 96 Ohio App.3d 611, 616, 645 N.E.2d 806. HCC asserts that, when given two different constructions, "the interpretation which makes a rational and probable agreement must be preferred." See Id., quoting *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 250, 313 N.E.2d 374, 378; *Graham v. Dry Dock Coal Co.*, 76 Ohio St.3d at 316. However, we find that the outcome will be the same under either type of review, whether any ambiguities in the wording are construed against the drafter, HCC, or whether it is interpreted in order to effectuate the "rational and probable" meaning.

{¶37} The Agreement stated that in addition to his base salary, Dr. Owusu would be "entitled to such year-end bonus ("Bonus") as the President of Hope, in

his absolute discretion, shall deem appropriate." However, that provision was modified by "Addendum #1" of the Agreement pertaining to "Bonus Compensation," which stated the following:

> **Bonus compensation will be calculated on collections as follows:**
>
> **$1,000,001.00 thru $3,000,000.00 – 5% on gross collections**
>
> **$3,000,001.00 and up -- $100,000.00 Bonus paid**
>
> **Minimum Bonus of $50,000.00 will be guaranteed for years 1 and 2 of employment.**
>
> **An advance of $25,000.00 from the first year guaranteed bonus of $50,000.00 shall be paid to [Dr. Owusu] in the first month of his start date of November 17, 2008.**

**{¶38}** The parties agree that gross collections were in excess of $6 million for 2009, so the above calculations would be applicable for that year. Gross collections were less than $1 million for the partial years that Dr. Owusu worked in 2008 and 2010, so the minimum $50,000 bonus would have been payable *if* Dr. Owusu was entitled to a bonus for those years.

**{¶39}** The Bonus Clause was considered to be ambiguous because the parties claimed that it was susceptible to several different interpretations. The trial court heard testimony from numerous witnesses as to what they considered the bonus clause to mean and what the parties claim they intended when it was drafted and signed. The parties gave opposing testimony as to their intent/interpretation,

so it was up to the trial court, as the trier of fact, to weigh the evidence, make credibility determinations, and apply the factual findings to the law.

{¶40} The first issue that we need to review concerns which years Dr. Owusu was entitled to receive a bonus. Dr. Owusu testified that Dr. Madan told him he would be entitled to $50,000 for 2008, even though he would have only worked for a short time. (Tr. 29-30.) However, we find that the plain language of the Agreement unambiguously contemplates a potential one or two-year agreement, and discusses salary and bonuses for "years 1 and 2 of employment." Dr. Owusu is not entitled to a bonus in *three* different years. Furthermore, the Addendum clearly specifies that the first "Term" of the Agreement began on November 17, 2008 and continued until December 31, 2009. Therefore, the time Dr. Owusu worked in 2008 and 2009, *combined*, counted for his first year's bonus. The trial court correctly found that Dr. Owusu was not entitled to be paid a separate bonus for 2008, and then another bonus for 2009.

{¶41} However, because the first Term ended on December 31, 2009, the time Dr. Owusu worked in 2010 counted for his *second year of employment*. The Bonus Addendum clearly states that a "Minimum Bonus of $50,000.00 will be guaranteed for *years 1 and 2 of employment*." (Emphasis added.) The Addendum did not specify any minimum amount of time or collections that were needed in

order for Dr. Owusu to qualify for a bonus in 2010, the second year of employment. HCC utilized a contrived reading of the Agreement's termination notice to compel Dr. Owusu to work an additional ninety days in 2010. (See footnote 1.) Now, HCC is attempting to proffer an equally contrived reading of the Agreement and Addendum to somehow find that the time worked in 2010 did not "count" towards a bonus in 2010. Even if one accepts HCC's argument that the Agreement was not renewed at the end of 2009, the Bonus Addendum speaks of "years of employment," not contract "Terms," and Dr. Owusu worked into the second year his employment.

{¶42} HCC also argues against paying Dr. Owusu a bonus for 2010 because Section 3 of the Agreement states that the bonus was intended to be a "year-end" bonus and Dr. Owusu did not stay until the end of 2010. However, the Addendum completely modified the bonus payment terms and HCC, by its own course of conduct, refuted the notion that the bonus was only to be paid at the end of the year. The record shows that HCC paid Dr. Owusu his bonus on a somewhat quarterly basis, with payments of $25,000 each made on the following dates: 11/21/2008, 4/30/2009, 7/09/2009, 10/01/2009, 10/22/2009, and 11/12/2009 (total of $150,000). (Ex. 35.) The trial court correctly found that Dr. Owusu was entitled to a $50,000 bonus for the time HCC insisted that he work in 2010.

Case No. 1-10-81

{¶43} The final bonus issue that must be resolved involves how much Dr. Owusu was entitled to receive for more than $6 million in gross collections for 2009. Both parties seem to agree that Dr. Owusu was entitled to a $100,000 bonus for the first $3 million in collections. They each arrived at this number by calculating the 5% bonus only on the amount of the gross collections *between* "$1,000,001.00 thru $3,000,000.00." Therefore, they each suggest we compute 5% of $2 million (with $2 million being the amount "between" $1 million and $3 million) to equal a $100,000 bonus. Although the testimony was very confusing on this issue, this is the amount that both parties agreed was correct and the trial court affirmed their intent as to this matter.[4]

{¶44} The primary area of contention regarding the 2009 bonus involves deciding what, if anything, is owed for collections exceeding $3 million. The

---

[4]While we agree that the Addendum is not a model of clarity, we believe that the plain language of the contract could also be interpreted as follows: If collections are less than $1 million, Dr. Owusu would be entitled to the $50,000 minimum bonus, regardless of the amount of collections. If collections exceed $1 million (the point at which 5% of collections reaches the $50,000 minimum), then he would be entitled to "5% *on gross collections*" as stated in the Addendum. (Emphasis added.) Therefore, the bonus would be calculated as follows, depending on the amount of gross collections: 5% x $1 million would be $50,000; 5% x $2 million would be $100,000; or, 5% x $3 million would be $150,000. The Addendum does not say the bonus is calculated on the amount of gross collections "*between*" $1 million and $3 million; its wording implies that if gross collections are between $1 million and 3 million ($1million "thru" $3million), then the bonus will be "**5% on gross collections**." If you calculate the bonus based upon the *parties'* interpretation, on collections of $1.2 million, for instance, you would only calculate the bonus on the amount that exceeds $1 million -- $200,000. Therefore, 5% x $200,000 would equal only a $10,000 bonus. Any earned bonus less than $2 million would already be included in the guaranteed minimum, so there was no point in listing the calculated amounts as starting at $1 million. When testifying, Mr. Brochetti, the person who drafted the Addendum, originally started to testify that a bonus on $3 million collections would be $150,000, until he was quickly interrupted and the question was "rephrased." (Tr. p. 204.)

Addendum stated "$3,000,001.00 and up -- $100,000.00 Bonus paid." HCC wanted the trial court to interpret this as meaning that $100,000 was the *maximum* bonus that could be paid in a year. Therefore, if Dr. Owusu received $100,000 for the first $3 million, then he would receive *nothing* for any amount over $3 million. HCC acknowledges that the Addendum does not contain the words "maximum," or "cap," but apparently believes that we should insert those words to comport with HCC's proffered interpretation.

{¶45} Dr. Owusu read the Addendum to mean that he would be entitled to $100,000 if collections were $3 million, and then he would be entitled to an additional $100,000 bonus for amounts exceeding $3 million in collections, for a total of a $200,000 bonus. He maintained that the additional "$100,000 paid" was a maximum, but only as to the *additional* bonus for amounts over $3 million – whether he earned $6 million, as he did, or even if he earned $16 million."

{¶46} We concur with Dr. Owusu's and the trial court's reading of the plain language in the Addendum. If HCC had intended $100,000 to be a "maximum" or "cap," it would have been very easy to insert either of those words. We cannot now create the contract that HCC wishes it had made. Furthermore, if HCC planned to pay a bonus only on amounts *up to* the first $3 million, then the line discussing amounts pertaining to "$3,000,001.00 and up" is superfluous and

completely unnecessary. Furthermore, HCC actually did pay Dr. Owusu $150,000, going above its stated "maximum."

{¶47} HCC asserts that it would be illogical to agree to pay an additional bonus of $100,000 even if Dr. Owusu only exceeded $3 million collections by one dollar. While there may be some rationale to this argument, that is what the Addendum states. Furthermore, it may have been just as illogical for Dr. Owusu to agree to limit his bonus, even if he brought in gross collections of $6 million, $10 million, or more. Under HCC's interpretation, Dr. Owusu did not earn a penny over the guaranteed minimum until collections reached over $2 million, and then they would be maxed out at $100,000 after only an additional million. There would be no incentive for Dr. Owusu to bring in collections over $3 million. The more revenue Dr. Owusu generated, the smaller the percentage his bonus became. Under HCC's interpretation, he would only receive a 3.3% bonus on collections of $3 million, which was further reduced with every dollar he brought in, resulting in only a 1.7% bonus for the $6 million collections he achieved. There was testimony that the other oncologist's bonus had been calculated on 6% of total gross collections, with no maximum cap whatsoever. Both sides were taking some risks in order to provide incentives and maximize their revenue. We determine the

parties true intentions from the language in the Addendum and from the trial court's findings of fact concerning the parties' intent.

{¶48} Furthermore, if this clause is ambiguous and the parties' intended meaning cannot be ascertained, then it must be construed against the drafter. HCC's agent, Dr. Brochetti, drafted the Bonus Addendum and Dr. Madan reviewed it before they presented it to Dr. Owusu. HCC had every opportunity to easily and simply specify what it is now trying to argue. For instance, to calculate the bonus HCC *claims* it intended to pay, the Addendum could simply have stated that Dr. Owusu "will be paid an annual bonus of 5% of the gross collections, with the maximum possible total annual bonus capped at $100,000. A minimum bonus of $50,000 will be guaranteed if collections do not reach $2,000,000." The language HCC chose to use did not state this.

{¶49} We affirm the trial court's determination that Dr. Owusu was entitled to a $200,000 bonus for 2009, based on the parties' stated intentions that a $100,000 bonus was payable on the first $3 million in collections. We also affirm the trial court's findings that Dr. Owusu was entitled to the minimum $50,000

bonus for his work in 2010, at HCC's request. [5] HCC's third assignment of error is overruled.

{¶50} Having found error prejudicial to the Appellant herein in the particulars assigned and argued in the first and second assignments of error, we reverse the judgment of the trial court as it pertains to its decision concerning the Non-Compete Clause and remand for further proceedings consistent with this opinion. We affirm the judgment of the trial court, as it pertains to the third assignment of error.

*Judgment Affirmed in Part,*
*Reversed in Part and Cause Remanded*

**SHAW, J., concurs in Judgment Only.**

**/jlr**

**ROGERS, P.J., concurring separately.**

{¶51} I fully concur in the majority's resolution of the first and second assignments of error. However, I concur separately as to the majority's

---

[5] We acknowledge that the construction and calculations set forth in the concurring opinion provide an equally reasonable, and probably more logical, way to interpret the meaning of this poorly worded Agreement. (See commentary in fn. 4.) However, we arrive at our affirmance of the trial court's decision on the third assignment of error based upon: (1) both parties' own testimony as to their stated understanding as to how they intended to calculate the Bonus on the first $3 million of collections; and, (2) deference to the trier of fact, who was present to observe the witnesses and hear their testimony. The resulting outcome is the same, utilizing either interpretation.

disposition of the third assignment of error, but only as to the manner of calculation of the amount due Owusu for his year-end bonus(es).

{¶52} First of all, the Agreement provides for a *year-end* bonus at the discretion of the President of HCC. That language can only be interpreted to provide for a bonus at the end of each full employment year. It appears the majority has interpreted the employment year to coincide with the calendar year, and I agree. However, in my opinion this eliminates any consideration of a bonus payment for the partial year Owusu worked in 2010, and is an additional argument for denying a separate bonus for 2008.

{¶53} The Addendum only provides the method of calculation of minimum bonuses. It does not impact when or how those bonuses were to be paid. Further, while the Addendum appears to set minimum levels of the bonus, nothing therein prevented the President from paying larger bonuses,[6] or partial payments before the end of the year.

{¶54} I do agree with the majority that the short period of time in 2008 was to be considered as part of the first "year" for purposes of computing a bonus.

---

[6] This would eliminate the majority's concern that Owusu's incentive to produce would cease after gross collections reached a certain level.

**{¶55}** By the above conclusions I have limited my consideration of a bonus to that required to be paid for 2009, and next consider the amount due for that period pursuant to the method of calculations required by the Addendum.

**{¶56}** Clearly there are three categories of collections defined by the Addendum: gross collections of $1,000,001 thru $3,000,000; $3,000,001 and up; and a minimum bonus of $50,000 guaranteed for years 1 and 2 of employment. Because the Addendum provides for three different categories, it is only reasonable to consider each as a separate calculation and requirement. For discussion purposes, it is more feasible to present the gross collections bonuses in a different order:

1.   Minimum bonus of $50,000 regardless of gross collections;

2.   Gross collections of $1,000,001 thru $3,000,000 @ 5% of gross collections, or $100,000; and,

3.   Gross collections of $3,000,001 and up, or $100,000.

**{¶57}** In my opinion, the only reasonable interpretation is that the first $50,000 is paid regardless of the amount of gross collections; that because gross collections reached the amount of $3,000,000, Hope was required to pay 5% for the gross collections between $1,000,001 and $3,000,000, or an additional bonus of $100,000; and because gross collections exceeded $3,000,001, Hope was required to pay an additional bonus of $100,000; or a total bonus for the 2009 year

-31-

of $250,000. I find each level to be a separate requirement. Otherwise, there is no logical reason for distinguishing the amounts and creating those levels.

{¶58} These calculations result in Hope owing Owusu a total of $250,000, of which it has already paid $150,000. The trial court did award Owusu $100,000, and therefore, I concur in the majority's affirmance of the trial court's award, although by different logic.