AMERICA'S FLOOR SOURCE, L.L.C., Appellee,

v.

JOSHUA HOMES et al., Appellants.

[Cite as *America's Floor Source, L.L.C. v. Joshua Homes,*
191 Ohio App.3d 493, 2010-Ohio-6296.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–1193.

Decided Dec. 21, 2010.

494

[black redaction bars]

James E. Arnold & Associates, L.P.A., James E. Arnold, and Damion M. Clifford, for appellee.

Freund, Freeze & Arnold L.P.A., Stephen C. Findley, and Richard J. Silk Jr., for appellants.

———

Tyack, Presiding Judge.

{¶ 1} Eric J. Schottenstein and Joshua Homes are appealing the civil judgment entered against them in the Franklin County Court of Common Pleas.

{¶ 2} Jason Goldberg is the CEO of America's Floor Source, L.L.C. ("Floor Source"), which he founded in July 2000 after leaving his family's central Ohio business, Rite Rug. Floor Source is an Ohio limited-liability company that provides retail and wholesale flooring to consumers and builders. Joshua Homes was a central Ohio residential-home builder, founded by Eric Schottenstein. Schottenstein and Goldberg became acquainted around 1997, when Schottenstein

went to Rite Rug to acquire special carpet for his luxury vacation home in Colorado. Goldberg and Schottenstein became friends.

{¶ 3} In the summer of 2000, Goldberg decided to leave his family business to start his own flooring business. In September 2000, Schottenstein cosigned a $200,000 line of credit for Floor Source at Bank One.[1] Goldberg also signed a personal guarantee of the debt. To insulate himself from risk, Schottenstein asked Goldberg for a $200,000 cognovit promissory note paying Schottenstein $20,000 per year, and also required Goldberg to carry $200,000 in life insurance, with Schottenstein and his wife as beneficiaries.

{¶ 4} Floor Source's business began to take off within its first year—so much so that Goldberg anticipated that they would need an additional line of credit. Goldberg then approached Schottenstein about cosigning a $300,000 line of credit and proposed that the parties should enter into a consulting agreement whereby Floor Source would pay Schottenstein $3,000 per month. The consulting agreement provided that Schottenstein would serve as a general business advisor to Floor Source, on an as-needed basis. Floor Source's new $300,000 line of credit took effect in January 2002, and although Schottenstein did not sign the consulting agreement until November 2004, in July 2002, Floor Source began paying him a $3,000 monthly fee called for in the agreement. Apparently, unbeknownst to Goldberg, Schottenstein never executed the guarantee for the $300,000 line of credit. Later in 2002, Bank One determined that Goldberg was financially solvent enough to guarantee the loan without Schottenstein, so the bank released Schottenstein from any obligation on the $200,000 line of credit.

{¶ 5} In January 2003, Floor Source regularly provided flooring to Joshua Homes for its new homes. Joshua Homes apparently did a significant amount of such business with Floor Source. However, by November 2005, Joshua Homes's account with Floor Source had become seriously delinquent. At one point, Joshua Homes owed nearly $300,000 to Floor Source for labor and materials. In an effort to save Joshua Homes from bankruptcy, Schottenstein solicited loans from lenders and family alike and came up with a plan to pay off the company's debts by selling assets to pay reduced amounts to its creditors.

{¶ 6} In May 2006, Schottenstein sent a reduction agreement to Floor Source, proposing that he would repay Floor Source $178,838.38, or roughly 60 percent of the balance owed, and that Schottenstein would personally guarantee that amount of payment. Goldberg initially rejected the offer.

{¶ 7} Goldberg claimed that Schottenstein subsequently made a new proposal, whereby Joshua Homes would repay Floor Source $178,000, and Schottenstein

---

1. Acquired by JP Morgan Chase Bank, N.A.

would personally pay an additional $96,000. Reference was made to Schottenstein's plan to plow additional capital into Joshua Homes by selling some of his purported $6 million real estate portfolio. Goldberg claimed that he and Schottenstein agreed to this arrangement. Schottenstein later denied that he ever offered to pay $96,000 personally over and above the $178,000 mentioned in the so-called reduction agreement between Joshua Homes and Floor Source. The jury found Goldberg more credible on this point.

{¶ 8} Immediately after entering into this reduction agreement, Joshua Homes incurred an additional $100,000 in debt to Floor Source, and by December 2006, Joshua Homes's account with Floor Source was again delinquent. Having received no payments from Schottenstein personally towards the alleged $96,000 guarantee, in January 2007, Goldberg proposed that he would start applying a $3,000 monthly consulting-fee payment towards the $96,000 debt due under the consulting agreement between Floor Source and Schottenstein personally. Schottenstein did not disagree in writing or contest the claim of a $96,000 personal guarantee in writing.

{¶ 9} Ultimately, Schottenstein failed to make good on any of his debts to Floor Source, both personally and on behalf of Joshua Homes, and the parties retained counsel in anticipation of litigation. The parties were unable to reach any agreement, and in March 2008, Floor Source filed suit against Schottenstein and Joshua Homes for breach of contract and promissory estoppel. Schottenstein filed his answer and counterclaim, denying that he had agreed to personally repay Floor Source for any of Joshua Homes's debt, and alleged that it was Floor Source that had breached the parties' contract(s), not Joshua Homes.

{¶ 10} Initially, Schottenstein was represented by Vorys, Sater, Seymour and Pease, L.L.P. ("Vorys"), but retained Luper, Neidenthal & Logan ("Luper firm") after Floor Source filed its complaint. About six months later, the Luper firm abruptly withdrew from the case, and Wiles, Boyle, Burkholder & Bringardner Co., L.P.A. ("Wiles firm") undertook Schottenstein's representation. The Wiles firm, then, abruptly ended its representation of Schottenstein in February 2009, which is when current counsel, Freund, Freeze & Arnold ("Freund"), assumed that role.

{¶ 11} When the Wiles firm withdrew, the discovery cutoff date for the lawsuit had already passed by more than a month. On March 9, 2009, Freund filed a motion on behalf of Schottenstein to modify the case schedule and vacate the trial date, which was set for the following month, April 6, 2009. The trial court did not issue a decision denying Freund's motion until June. However, on March 11, 2009, the trial court confirmed an April 6, 2009 trial date and ordered that the parties submit to mediation. Because of a docketing conflict, the trial court later

continued the trial to July 13, 2009. The court also referred the case to a visiting judge.

{¶ 12} A jury trial was conducted. At the end of the trial, the jury found that (1) Schottenstein had made an oral agreement personally to pay $96,000 to Floor Source, (2) Schottenstein had breached the consulting agreement between Floor Source and Schottenstein personally, and that (3) Schottenstein was estopped from denying his promise to pay $96,000 to Floor Source on the personal guarantee. The jury awarded Floor Source $24,000 in damages for Schottenstein's breach of the consulting agreement and $96,000 on the personal-guarantee claim. The jury also sanctioned ending the consulting agreement between Floor Source and Schottenstein personally. The agreement had called for payments to Schottenstein and his wife for the duration of their lives.

{¶ 13} Following the verdict, Schottenstein moved for judgment notwithstanding the verdict, based on the court's denial of his motion to reopen discovery. The court denied Schottenstein's motion, finding, "[I]t appears that [the] records [Schottenstein] sought * * * were actually in [his own hands] prior to the filing of this lawsuit."

{¶ 14} Schottenstein and Joshua Homes filed a timely notice of appeal and now present six assignments of error for our consideration:

[I.] The trial court erred in overruling Appellants' motion to modify the case scheduling order while continuing the original trial date.

[II.] The trial court erred in entering judgment against Eric Schottenstein individually based upon the actions taken by him in his capacity as president of Joshua Homes.

[III.] The trial court erred in allowing the jury to interpret, without guidance from the trial court, unambiguous contract language.

[IV.] The trial court erred in permitting evidence of, and entering judgment against Eric Schottenstein individually for, an alleged oral promise to pay the debt of Joshua Homes, contrary to the parol evidence rule and the Statute of Frauds.

[V.] The trial court erred in permitting evidence of, entering judgment based upon, and awarding damages for, a claim of frustration of purpose.

[VI.] The trial court erred in permitting the jury to see a photograph and hear evidence related to Eric Schottenstein's personal residence; and other debt-related lawswuits against Appellants.

{¶ 15} The second assigned error essentially argues that the verdict was against the manifest weight of the evidence. This assignment of error requires an in-depth review of the facts and evidence adduced at trial. We will therefore

address the second assigned error first, followed by the other alleged errors as they are relevant or applicable.

{¶ 16} The jury having found that Schottenstein was not credible when he totally denied personally guaranteeing a payment of $96,000, Schottenstein now argues in the second assigned error that his oral promise to personally pay Floor Source $96,000 for debts incurred by Joshua Homes is unenforceable because of the statute of frauds. Under R.C. 1335.05,[2] a person's promise to pay the debt of another must be in writing to be enforceable. R.C. 1335.05 reads:

> No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person; nor to charge an executor or administrator upon a special promise to answer damages out of his own estate; nor to charge a person upon an agreement made upon consideration of marriage, or upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

> No action shall be brought to charge a person licensed by Chapter 4731. of the Revised Code to practice medicine or surgery, osteopathic medicine or surgery, or podiatric medicine and surgery in this state, upon any promise or agreement relating to a medical prognosis unless the promise or agreement is in writing and signed by the party to be charged therewith.

{¶ 17} The issue to be resolved with respect to this assignment of error is whether some reason exists under law or equity to fail to enforce R.C. 1335.05.

{¶ 18} The first part of that issue is whether Schottenstein was in fact agreeing to pay the debt of another person. Joshua Homes was, in actuality, the name under which Joshua Investment Company did business. Eric Schottenstein was the sole shareholder of Joshua Investment Company. As president of the company, he was in complete control. The company was, for purposes of R.C. 1335.05, however, another person. Floor Source and Goldberg could not enforce the $96,000 sum Goldberg alleged that Schottenstein had promised to pay from Schottenstein's own funds unless Goldberg and Floor Source had a document that

---

2. "No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt * * * of another *person* * * * unless the agreement upon which such action is brought, *or some memorandum or note thereof,* is in writing and signed by the party to be charged." (Emphasis added.)

was actually signed by Schottenstein in which the promise to pay was embedded. No such document was presented in evidence at trial.

{¶ 19} Counsel for Floor Source produced several e-mails from Goldberg to Schottenstein that referred to the $96,000 promise. The record of payments from Goldberg and Floor Source show a crediting of payments due Schottenstein toward the $96,000 sum at some point. However, Schottenstein never acknowledged an obligation to pay in writing. Instead, he denied under oath at trial that he had ever made such a promise. On its face, R.C. 1335.05 bars collection of the $96,000.

{¶ 20} Ohio case law has recognized situations in which R.C. 1335.05 will not be enforced. In *Wilson Floors Co. v. Sciota Park, Ltd.* (1978), 54 Ohio St.2d 451, 8 O.O.3d 444, 377 N.E.2d 514, the Supreme Court of Ohio held in the syllabus, "When the leading object of the promisor is not to answer for another's debt but to subserve some pecuniary or business purpose of his own involving a benefit to himself, his promise is not within the statute of frauds, although the original debtor may remain liable." See also *Crawford v. Edison* (1887), 45 Ohio St. 239, 13 N.E. 80, syllabus; see also *Am. Wholesale Corp. v. Mauldin* (1924), 128 S.C. 241, 122 S.E. 576, 577.

{¶ 21} Schottenstein's promise to personally pay a portion of his company's debt was clearly in his own best interest, since he wanted Floor Source to continue providing Joshua Homes with labor and materials, from which Schottenstein and his company were deriving revenue. Applying *Wilson Floors*, 54 Ohio St.2d 451, 8 O.O.3d 444, 377 N.E.2d 514, as we must, we conclude that the promise to pay is not within R.C. 1335.05, Ohio's statute of frauds.

{¶ 22} Based on *Wilson Floors*, the trial court did not err in entering judgment against Eric Schottenstein in his individual capacity. We therefore overrule the second assignment of error and the portion of the fourth assignment of error that refers to the statute of frauds.

{¶ 23} The fourth assignment of error also alleges a violation of the parol evidence rule with respect to the evidence regarding Schottenstein's promise to pay $96,000 of debt run up by Joshua Homes. The reduction agreement was executed in conjunction with the reduction of approximately $120,000 of the debt owed by Joshua Homes to Floor Source. The agreement is, in actuality, a letter dated May 12, 2006, from "Joshua Homes" by "Eric Schottenstein, President" to Jason Goldberg, America's Floor Source. The letter promises a capital infusion of $2 million to Joshua Homes from "Capital Sources" and the infusion of an additional $900,000 to be realized from the sale of model homes owned by Joshua Homes. In actuality, only $1 of the $2 million from Capital Sources was provided, and no funds from the sale of model homes were provided to pump up

the capital position of Joshua Homes. Schottenstein promised to personally guarantee the 60 percent balance of the debt owed to Floor Source from Joshua Homes as set forth in the so-called "reduction agreement." The document does not refer to any other personal debt from Schottenstein to Goldberg or Floor Source.

{¶ 24} Because Schottenstein did not fulfill the condition upon which the agreement was based, namely the infusion of $2.9 million into Joshua Homes, arguably the agreement was and is not enforceable. Further, the agreement does not directly address any additional promise of payment from Schottenstein personally. Further, the document lacks the usual contract language that expressly states that the agreement is the complete contract involving Joshua Homes, Floor Source, Schottenstein personally, and Goldberg personally.

{¶ 25} Under the circumstances, we cannot find that the trial court erred in allowing in the oral/"parol" evidence about the promise of Schottenstein to pay an additional $96,000 of his own funds in order to get Goldberg to agree to the approximately $120,000 reduction in the debt of the entity called "Joshua Homes."

{¶ 26} The balance of the fourth assignment of error is overruled.

{¶ 27} Appellant's sixth assignment of error attacks the trial court's decision to admit a photograph of Schottenstein's residence over objection. In fact, the trial court refused to admit the photograph when Floor Source first proffered it. However, once Schottenstein testified to his alleged downtrodden personal finances, the court found that the evidence was relevant:

> Well, I don't know, I was sitting here thinking if he's talking, to start independently sitting here thinking is started to talk about his personal accounts and personal finances in saying *I'm just a poor guy trying to struggle along* when in fact, they evidence he's living in a monstrous house, or I guess
> * * *
>
> * * *
>
> * * * a very large, large, large home. I'm going to let them bring that up over your objection.

It is well established that the decision to admit or exclude evidence is within the sound discretion of the trial court and that an appellate court will not disturb that decision absent an abuse of discretion. See, e.g., *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus; see also *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 33, citing *State v. Sumlin* (1994), 69 Ohio St.3d 105, 108, 630 N.E.2d 681, on remand, *State v. Swann*, 10th Dist. No. 06AP–870, 2008-Ohio-6957, 2008 WL 5423572, ¶ 2 ("[W]e hold that the trial court abused its discretion in concluding that the evidence

proffered * * * was insufficient to confirm the trustworthiness of the third-party's confession"). This is because the trial court is in a much better position than we are to evaluate the authenticity of evidence and assess the credibility and veracity of witnesses. See, e.g., *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 129; *State v. Chandler*, 10th Dist. No. 09AP–394, 2009-Ohio-5858, 2009 WL 3681649, ¶ 22 (the trial court is in a better position to weigh the credibility of witnesses). The trial court is thus vested with broad discretion in evidentiary matters, and the court of appeals will not disturb the trial court's ruling absent an abuse of discretion. See, e.g., *Sage*; *State v. Hairston*, 10th Dist. No. 08AP–735, 2009-Ohio-2346, 2009 WL 1396434, ¶ 27. An abuse of discretion is more than an error of law or in judgment; rather, it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144; *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855; *Conner v. Conner* (1959), 170 Ohio St. 85, 9 O.O.2d 480, 162 N.E.2d 852; *Chester Twp. v. Geauga Cty. Budget Comm.* (1976), 48 Ohio St.2d 372, 2 O.O.3d 484, 358 N.E.2d 610. In this circumstance, the trial court stated a valid and legitimate reason for admitting the photograph of Schottenstein's home over objection. Even if the evidence would be irrelevant under ordinary circumstances, the photograph became relevant once Schottenstein put his own personal wealth—or purported lack thereof—at issue.

{¶ 28} Furthermore, other than the fact that the verdict was not favorable towards him, Schottenstein has not demonstrated that he was prejudiced by the alleged error. He testified that he received the benefit of $1 million from his parents' marital trust, which was to be set off against his future inheritance. Further, he was a trustee of the trust. The jury could infer from Schottenstein's testimony that he was a wealthy man from a wealthy family. The fact that he lived in a large house was not prejudicial. Further, Schottenstein testified that a $2.5 million mortgage was due with respect to the house. A picture of the house did not prejudice him under the circumstances.

{¶ 29} Accordingly, we overrule the sixth assignment of error.

{¶ 30} In the fifth assignment of error, appellant argues that Ohio law does not recognize the doctrine of frustration of purpose. We disagree. To fully address this assignment of error, we must again address the facts underlying this so-called consulting agreement between Eric Schottenstein and Floor Source.

{¶ 31} When Goldberg wished to start his own business, he needed access to capital. His personal assets were not sufficient to justify the credit line of $200,000 needed to start the business. Schottenstein agreed to co-sign for the $200,000 to assist Goldberg, who at that time was a close personal friend.

{¶ 32} A year later, the credit line needed to be renewed, and Schottenstein again co-signed.

{¶ 33} Shortly thereafter, Goldberg felt that he needed to expand the line of credit to $300,000. He approached Schottenstein about helping to acquire the additional credit. Schottenstein agreed to help, but never got around to signing the documents to increase the credit line. Later, the bank decided that Goldberg and his company were sufficiently credit-worthy that Schottenstein could be released from any obligation on the $200,000 note related to the $200,000 line of credit. The bank also increased the line of credit without Schottenstein's signature.

{¶ 34} In response to Schottenstein's expression of willingness to risk $300,000 for Goldberg's well-being, Goldberg sought to express his gratitude via a consulting agreement, under the terms of which Schottenstein and his wife would receive payments for the rest of their lives in return for Schottenstein's serving as a business advisor to Goldberg and Floor Source. At the time, Schottenstein's name was highly regarded in the community, and Schottenstein's reputation for having built up Joshua Homes was an asset.

{¶ 35} This all changed when Joshua Homes ran into serious financial difficulty and stopped paying many of its bills. Despite this close relationship, Schottenstein allowed a debt of almost $300,000 to accumulate to Floor Source. Many other companies that provided materials to Joshua Homes went unpaid, and Schottenstein's reputation in the community plummeted. His ability to give credible advice about how to grow or run a business became highly questionable. In the context of the present case, the value of his consulting services radically reduced or disappeared altogether.

{¶ 36} As a part of this litigation, Floor Source sought to be relieved of the monthly payments to Schottenstein and his wife under the consulting contract, alleging that the purposes of the contract have been frustrated.

{¶ 37} Frustration of purpose occurs when one of the two parties to a contract creates a situation where the basis of the parties' contract essentially becomes moot. The doctrine is defined in the Restatement of the Law 2d, Contracts (1981) 334, Section 265, as follows:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

{¶ 38} Appellant argues that frustration of purpose is not widely accepted in Ohio. However, frustration of purpose could be described as a form of breach

of contract. If a party to a contract creates a situation whereby it cannot fulfill its obligations under the contract, the party is in breach of the contract.

{¶ 39} Schottenstein exercised complete control over Joshua Homes. He exercised control over which companies that helped Joshua Homes construct residences would be paid and how much. Part of what Schottenstein did was decide not to pay Floor Source what was due. That decision was clearly not in the best interests of Floor Source, for whom Schottenstein was a paid business consultant.

{¶ 40} Schottenstein asked Floor Source to walk away from 40 percent of the money it was owed and then offered a smaller debt reduction to some of the other contractors. Further, the jury found that Schottenstein did in fact promise to pay $96,000 personally in order to convince Goldberg and Floor Source to accept the 40 percent reduction in accounts due. Schottenstein's subsequent and continued denial of that promise suggests that he was less than candid in his dealings with Goldberg and Floor Source in order to get a signature on the reduction agreement, conduct that breached the contract to give professional business advice to Goldberg and Floor Source.

{¶ 41} The evidence before the jury demonstrated that Schottenstein frustrated the purpose of the contract as that doctrine is set forth in the Restatement of the Law 2d, Contracts, and in persuasive cases from other states and districts.

{¶ 42} The evidence also demonstrated that Schottenstein totally breached the contract for his personal services. Whether couched in terms of frustration of purposes or in terms of breach of contract, the evidence of Schottenstein's conduct was appropriately before the jury, and damages based upon that conduct were appropriately awarded.

{¶ 43} The fifth assignment of error is overruled.

{¶ 44} In the third assignment of error, appellant argues that the trial court improperly allowed the jury to determine the terms of the contract. The record does not suggest that the trial court allowed the jury to interpret the contract; what the record does demonstrate is that the trial court charged the jury with the determination of whether a contract existed. It is well established that the existence of a contract—i.e., an offer and acceptance—is an issue for the trier of fact. See, e.g., *Oglebay Norton Co. v. Armco, Inc.* (1990), 52 Ohio St.3d 232, 235, 556 N.E.2d 515 (whether parties intended to be bound by a contract is a question of fact for the jury).

{¶ 45} We do not find any error in this regard. Furthermore, it is not apparent from the record that appellant preserved this issue for appeal. Accordingly, we overrule the third assignment of error.

{¶ 46} Lastly, we address appellant's first assigned error, in which he argues that the trial court erred by overruling the motion to modify the case-management scheduling order. We review alleged errors in discovery decisions also for abuse of discretion. See, e.g., *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1 ("The discovery rules give the trial court great latitude * * *. A reviewing court's responsibility is merely to review these rulings for an abuse of discretion").

{¶ 47} To constitute an abuse of discretion with regard to discovery rulings, the trial court's action(s) "must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." Id.

{¶ 48} Appellants raised this issue with the trial court prior to trial, at which time the court "found no reason to alter the earlier ruling [denying appellants' motion to modify]," and again raised the issue in a post-trial judgment-notwith-standing-the-verdict motion, which the trial court denied.

{¶ 49} Therein, the trial court noted that in their memorandum in support of the motion to modify, "[I]t appears that [the] records defendants sought from plaintiff in discovery were actually in the hands of the defendants prior to the filing of this lawsuit." Id. at 4.

{¶ 50} As the trial court also noted, the primary purpose of procedural rules (including those governing discovery) is "to effect just results." See, e.g., *Jones v. Murphy* (1984), 12 Ohio St.3d 84, 87, 12 OBR 73, 465 N.E.2d 444; *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 174–175, 63 O.O.2d 262, 297 N.E.2d 113; see also *Curtis v. Cent. Ohio Neurological Surgeons, Inc.,* 10th Dist. No. 09AP–58, 2009-Ohio-6770, 2009 WL 4936329, ¶ 14–15. Furthermore, the trial court pointed out that "[o]ther than a general claim that they were denied the right to prepare for trial, the defendants have not identified discoverable material that was not produced, thereby denying them a fair trial."

{¶ 51} In light of all these factors, there is nothing in the record to suggest that the trial court acted unreasonably, arbitrarily, or unconscionably with regard to its denial of appellants' motion to modify the case-management order. Accordingly, we overrule the first assignment of error.

{¶ 52} Having overruled all six assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

BRYANT and BROWN, JJ., concur.