[Cite as *B.W. Rogers Co. v. Wells Bros., Inc.*, 2012-Ohio-750.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SHELBY COUNTY


B.W. ROGERS CO.,

    PLAINTIFF-APPELLEE,               CASE NO. 17-11-25

    v.

WELLS BROTHERS, INC., ET AL.,         O P I N I O N

    DEFENDANTS-APPELLANTS.


Appeal from Shelby County Common Pleas Court
Trial Court No. 10CV000285

Judgment Affirmed

Date of Decision:   February 27, 2012


APPEARANCES:

    *Jonathan S. Zweizig* **for Appellants**

    *Richard H. Wallace and Kiera M. Sullivan* **for Appellee**

**WILLAMOWSKI, J**.

{¶1} Defendants-Appellants, Wells Brothers, Inc. ("Wells") and Panel Control, Inc. ("PCI") (or, collectively, "Wells/PCI" or "Appellants"), appeal the judgment of the Shelby County Court of Common Pleas, finding that the Memorandum of Intent that was entered into between Wells/PCI and Plaintiff-Appellee, B. W. Rogers Co. ("BWR" or "Appellee"), was a binding, enforceable contract. On appeal, Wells/PCI contends that the trial court erred when it failed to grant its motion for summary judgment; when it found that a valid agreement existed; when it erroneously "filled in the gaps" in the purported agreement; and when it failed to enforce the terms/time limitations of the alleged contract. For the reasons set forth below, the judgment is affirmed.

{¶2} BWR is in the business of distributing mechanical and electrical components along with providing control panels. Wells/PCI is primarily engaged in construction and related services, although a small percentage of its business is also in the area of control panels. BWR and Wells/PCI are direct competitors in the control panel business. (Tr. pp. 194-195; 201)

{¶3} Andrew Haag ("Haag") was one of four key managers at BWR, and was principally involved in the panel business. (Tr. pp. 105-106) Haag had signed a non-competition and non-solicitation agreement with BWR in January

2009 ("Non-Compete Agreement").[1]  Haag left BWR in June of 2009, and BWR exercised its right to enforce the Non-Compete Agreement.  Haag accepted a check from BWR for $60,978.10 and agreed not to compete against BWR.  (Tr. p. 13)  Haag then went to work for Wells/PCI shortly thereafter.  (*Id.*)  In September of 2009, BWR filed a lawsuit against Haag seeking an injunction and enforcement of the Non-Compete Agreement,  Shelby County Common Pleas Case No. 09-CV 364 ("Prior Litigation").  Wells/PCI was not a party to this lawsuit, but its attorney, Robert Harrelson ("Atty. Harrelson" or "Wells/PCI's attorney") represented Haag in the litigation.

{¶4} On October 9, 2009, rather than taking Haag's scheduled deposition, BWR, Haag, and Wells/PCI entered into extensive, day-long settlement negotiations.  The negotiations on behalf of BWR were conducted by Thomas Fusonie ("Atty. Fusonie" or "BWR's attorney"), and Atty. Harrelson, who represented the interests of Wells, PCI and Haag.  The negotiations resulted in a hand-written, three-page document styled a "Memorandum of Intent" (hereinafter, "MOI").  Although Wells/PCI's attorney wrote the agreement, it was a joint effort and was thoroughly discussed by all, including BWR's attorney, Haag, and James Verona ("Verona"), a V.P. of BWR who was present at the negotiations.  In addition, Wells/PCI's attorney personally contacted Wells/PCI's V.P. of Finance

---

[1] This Non-Compete Agreement was a springing covenant which provided that it was at the election of BWR, if Haag left employment with BWR, to pay Haag compensation not to compete against BWR for a period of time.  (Tr. p. 12)

and Sales Manager, Ken Steinke, and read and discussed the terms with him. Verona consulted with Rick Rogers, president of BWR, concerning the settlement. All were in agreement with the terms, and Atty. Harrelson was authorized to sign the MOI on behalf of Wells and PCI; Verona signed on behalf of BWR; and Haag signed personally.

{¶5} The MOI contained six paragraphs setting forth the settlement and agreement between the parties and was intended to be a type of "global settlement." (Tr., p. 18; Trial Exhibit 1 - MOI) The primary purpose of the MOI was to provide BWR with consideration in return for BWR's agreement to dismiss its case against Haag, and to allow Haag to continue to work for Wells/PCI, which directly violated the Non-Compete Agreement. (Tr. p. 31)

{¶6} Paragraphs 2 and 4 of the MOI provided that the benefits to BWR were to be as follows: (1) Wells/PCI was not to compete, solicit, or interfere with any existing BWR customers involved in the panel and/or distribution business, excluding the Peerless and Stolle customers (the Peerless and Stolle companies were both in Wells/PCI's top ten panel customers, as well as being customers of BWR); and, (2) Wells/PCI was to make BWR the preferred supplier for any electromechanical components for which BWR was an authorized distributor. (Tr. p. 33; Ex. 1) BWR was to provide its customer list to Wells/Haag "for an agreement of said customers, subject to reasonable confidentiality protection."

(Ex. 1) If Wells/PCI violated this provision within the two-year period, Wells/PCI was to pay BWR 25% of any such improper sales.

{¶7} Paragraphs 1, 3, and 5 of the MOI settled issues with Haag and provided that Haag could continue employment with Wells; he was to return $40,000 of the non-compete payment to BWR, and BWR was not obligated to make any more payments to him; and, he was prohibited from engaging in any activities relating to the distribution and panel business during the two-year period of non-compete/non-solicitation. It was specifically stated in the MOI that Haag was to have no contact with Peerless and Stolle and he was not to discuss business concerning Peerless and Stolle with any employees or officers of Wells/PCI. (Ex. 1) In return, BWR would allow Haag to keep $20,978.10 of the non-compete payment, and it would dismiss the litigation against Haag with an agreed consent order to be signed by the trial court. (*Id.*)

{¶8} Paragraph 6 stated that the agreement between BWR and Wells/PCI would be "prepared as a separate out of court agreement signed by appropriate representatives of each company." (Ex. 1)

{¶9} Subsequent to enacting the MOI, the parties took various steps to implement the terms of the agreement. Haag returned $40,000 to BWR, and BWR filed the Consent Order with the trial court on January 21, 2010, dismissing the Prior Litigation against Haag. BWR's attorney drafted a formal agreement

between the parties, based upon the MOI, and sent Wells/PCI a copy of its customer list. Wells/PCI's attorney made some modifications to the agreement, and the two attorneys communicated and exchanged emails over a period of time in an attempt to have the finalized, formal written document be consistent with the terms set forth in the MOI.

{¶10} The parties did not appear to have major differences concerning most of the terms of the final document, but difficulties arose concerning BWR's customer list. Wells/PCI objected to BWR's first submitted list, which appeared to be a data dump of over 10,000 customers. The two attorneys continued to work to modify the list, with Wells/BCI requesting two separate lists (separating panel from distribution customers) and requesting a reduction to customers in just the immediate tri-state area. BWR complied with these requests, eventually resulting in a list of about five or six hundred customers. However, this list was still not acceptable to Wells/PCI, who insisted an additional fifty customers be removed from the list as apparently these companies were also customers of Wells/PCI. Extensive efforts were made to create a list that was acceptable, but to no avail.

{¶11} At some point, BWR concluded that Wells/PCI was not acting in good faith and that there would never be an existing customer list that Wells/PCI would find acceptable. (Jun. 3, 2011 J.E., p. 3) In June of 2010, BWR filed a

two-count complaint against Wells and PCI, requesting: (1) declaratory judgment and an order enforcing the MOI; and (2) damages for breach of the MOI.

{¶12} Following discovery by all sides, Wells/PCI filed a motion for summary judgment in January of 2011, arguing that a "meeting of the minds" never existed between the parties as to a customer list, and that since there was no final agreement, a settlement could not be enforced. BWR responded, contending that there was a meeting of the minds, that the terms of a settlement agreement had been reached, that Wells/BCI breached that agreement, and that the issues raised by Wells/PCI merely concerned the interpretation of an existing agreement. The trial court denied the motion, finding there were genuine issues of material fact.

> This Court finds that there is an issue as to whether a settlement agreement was reached between the parties. Certainly the fact that there were acts in furtherance of a settlement, e.g., a dismissal of a pending action, suggests that a settlement was reached. Other facts suggest that the terms of a settlement agreement were not finalized and that, therefore, there was not a meeting of minds. There is a dispute between the parties as to whether the essential terms had been agreed upon. Disputed issues of fact cannot be resolved by summary judgment. (Mar. 25, 2011 Order denying Wells/PCI's motion for summary judgment, p. 3)

{¶13} A one-day bench trial was held on April 12, 2011, concerning the issue of whether or not the parties had entered into an enforceable agreement. The two attorneys and officers/principals from each of the companies testified and presented documentary exhibits. The trial court eventually found that the MOI constituted an enforceable agreement, holding that:

> In this case the evidence is clear the parties negotiated and intended to enter into a settlement agreement. The fact that they prepared a handwritten Memorandum of Intent signed by the respective parties or their representative is evidence these were not merely negotiations to be finalized at a later time but an intention to enter into a binding contract. The parties' conduct subsequent to the settlement negotiations also supports the intention and the belief that the parties had entered into a settlement agreement. (Jun. 3, 2011 J.E., p. 3)

{¶14} The trial court ordered that BWR was to submit a list of existing customers (defined as customers making purchases within three years) for Wells/PCI to confirm that the list was in fact a list of existing customers in panel/distribution." Furthermore, since BWR had not received the bargained for benefit, instead of the enforceable period of the agreement ending two years after the October 9, 2009 signing of the MOI, the two-year period was to begin on the date of the filing of the judgment order and run for two years thereafter. (*Id.*, p. 6)

{¶15} It is from this judgment that Wells and PCI now appeal, raising the following four assignments of error for our review.

**First Assignment of Error**

**The trial court erred as a matter of law in overruling [Wells'] Motion for Summary Judgment as there existed no genuine issue of material fact and Appellants were entitled to judgment as a matter of law.**

**Second Assignment of Error**

**Following the bench trial, the trial court erred as a matter of law in finding that "the parties entered into a binding, enforceable Settlement Agreement on October 9, 2009."**

**Third Assignment of Error**

**The trial court erred in "filling in the gaps" of the Memorandum of Intent in a manner that resulted in an unfair, unjust and unintended result.**

**Fourth Assignment of Error**

**Assuming *arguendo*, that the trial court's finding of an enforceable contract was not erroneous, the trial court erred in not enforcing the terms of the contract.**

*First Assignment of Error – Ruling on Summary Judgment*

{¶16} In the first assignment of error, Wells/PCI asserts that the trial court erred in overruling its motion for summary judgment because it claimed that the determination as to whether there was a settlement agreement between the parties was a question of law. Wells/PCI contends that there were no genuine issues as to the "fact" that there was no meeting of the minds as to all of the essential terms of the MOI on October 9, 2009. Therefore, the trial court should have found that no agreement existed and granted its motion for summary judgment.

{¶17} Ordinarily, "the denial of a motion for summary judgment is not a point of consideration in an appeal from a final judgment entered following a trial on the merits." *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 156, 1994-Ohio-362, 642 N.E.2d 615. If a trial court denies a summary-judgment motion due to the existence of genuine issues of material fact, and a subsequent trial results in a verdict for the party who did not move for summary judgment, then

any error in denying the motion for summary judgment is rendered moot or harmless. *Id.* at the syllabus; *Schnipke v. Safe-Turf Installation Group, L.L.C.*, 190 Ohio App.3d 89, 2010-Ohio-4173, 940 N.E.2d 993, ¶¶ 15-16 (3d Dist.). To allow a summary-judgment decision based upon less evidence to prevail over a verdict reached on more evidence would defeat the fundamental purpose of judicial inquiry. *Whittington* at 157.

{¶18} In the case before us, the trial court found that there were genuine issues of material fact such that it was necessary to hold a trial in order to decide those issues. After hearing the testimony from both sides, the trial resulted in a verdict in favor of BWR, the party who did not move for summary judgment. Therefore, the trial court's ruling on Wells/PCI's motion for summary judgment was rendered moot by the subsequent judgment.

{¶19} However, Wells/PCI claims that *Whittington* is not applicable to this case because it maintains that the determination as to whether there is a settlement agreement is a question of law. Wells/PCI argues that "error in the denial of a summary-judgment motion that presents a purely legal question is not rendered harmless by a subsequent trial on the merits," quoting *Capella III, LLC v. Wilcox*, 190 Ohio App.3d 133, 139, 2010-Ohio-4746, 940 N.E.2d 1026, ¶ 14 (10th Dist.).

{¶20} However, we find that *Capella* and the other cases cited by Wells/PCI in support of its position are pertinent only to issues that present a

"*purely* legal question." (Emphasis added.) *Id.* In this case, the trial court found that there were issues of fact that needed to be resolved before it could determine whether or not there was a meeting of the minds and whether the parties actually intended to be bound when they executed the MOI.

{¶21} The Ohio Supreme Court has stated that the issue of "whether the parties intended to be bound * * * is a question of fact properly resolved by the trier of fact." *Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St.3d 232, 235, 556 N.E.2d 515 (1990); *Normandy Place Associates v. Beyer*, 2 Ohio St.3d 102, 1015, 443 N.E.2d 161 (1982) ("Whether the parties intended a contract remains a factual question, not a legal one, and as such is an issue to be resolved by the finder of fact."). *See, also*, *America's Floor Source, L.L.C. v. Joshua Homes,* 191 Ohio App.3d 493, 2010-Ohio-6296, 946 N.E.2d 799, ¶ 44 (10th Dist.) ("It is well established that the existence of a contract * * * is an issue for the trier of fact.*"*); *Gruenspan v. Seitz*, 124 Ohio App.2d 197, 211, 705 N.E.2d 1255, 1264 (8th Dist.1997); *Guardian Alarm Co. v. Portentoso*, 3d Dist. No. 13-10-54, 2011-Ohio-5443, ¶ 17.

{¶22} Wells/PCI frequently refers to *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 1997-Ohio-380, 683 N.E.2d 337, for the proposition that a court should be reluctant to enforce a settlement agreement where there is uncertainty as to whether the parties agreed on all of the terms. (Appellant's Brief, pp. 8, 11, 14,

19) However, the primary issue in *Rulli* was whether the trial court erred "by ordering the enforcement of a disputed settlement agreement *without first conducting an evidentiary hearing*." (Emphasis added.) *Id.* at 376. The full and complete holding of the Ohio Supreme Court, stated at the syllabus, is that "[w]here the meaning of terms of a settlement agreement is disputed, or where there is a dispute that contests the existence of a settlement agreement, a trial court *must conduct an evidentiary hearing* prior to entering judgment." (Emphasis added) *Id.*

{¶23} Because there was an issue of fact as to whether or not the parties had entered into a valid agreement, the trial court was required to hold an evidentiary hearing before making a ruling. The trial court did not err by denying Wells/PCI's motion for summary judgment; and, in any case, the issue was rendered moot by the subsequent trial on the merits. The first assignment of error is overruled.

*Second Assignment of Error – Finding an Enforceable Contract*

{¶24} In the next assignment of error, Wells/PCI maintains that the trial court erred in finding that an enforceable agreement existed because there was not a "meeting of the minds" on an essential element of the MOI (the customer list), and therefore, there was no final agreement. Wells/PCI asserts that no enforceable contract exists until all of the details of the purported agreement have been settled.

{¶25} BWR, however, submits that the parties agreed to all of the essential elements, and executed an enforceable contract on October 9, 2009 in the form of the MOI. BWR claims that the controversy is not as to whether or not a contract was created, but rather it is merely a matter of a disagreement over contract interpretation concerning one of the terms in the contract.

{¶26} The elements necessary to form a contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object of consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. Additionally, "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.*; *Episcopal Retirement Homes, Inc. v. Ohio Dep't. of Industrial Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991).

{¶27} A settlement agreement is a type of a contract, and is highly favored in the law. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.,* 74 Ohio St.3d 501, 502, 660 N.E.2d 431, 432 (1996). To be enforceable as a binding contract, a settlement agreement requires no more formality than any other type of contract. It need not necessarily be signed, as even oral settlement agreements may be enforceable. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 15. Settlement agreements are

contracts, therefore, the interpretation of a settlement agreement is governed by the law of contracts.[2] *Chirchiglia v. Ohio Bur. of Workers' Comp.,* 138 Ohio App.3d 676, 679, 742 N.E.2d 180 (7th Dist.2000).

{¶28} Wells/PCI argues that all of the details of the document had not yet been worked out and points out that a final, formalized agreement was contemplated by the parties. However, Ohio has long recognized the general validity of preliminary agreements. *See, e.g., Normandy Place Associates v. Beyer*, 2 Ohio St.3d at 105, citing to *Rhodes v. Baird*, 16 Ohio St. 573 (1866). "It is thus not the law that an agreement to make an agreement is per se unenforceable. The enforceability of such an agreement depends rather on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced." *Id.*;

---

[2]  Throughout its brief, Wells/PCI often cites to *Rulli* and other cases for the proposition that a court should be extremely cautious in enforcing a "settlement agreement," because a settlement agreement is a specialized type of contract upon which a trial court will issue a final judgment. See *Rulli v. Fan Co.*, 79 Ohio St.3d at 376. As such, Wells/PCI urges that caution should be taken because a settlement agreement eliminates the right to adjudication by trial, and judges should make certain the terms of the agreement are clear, and that the parties agree on the meaning of those terms. *See id.* However, we observe that the MOI in this case was a type of "hybrid" settlement agreement. It was certainly a settlement agreement between BWR and Haag, as it settled the Prior Litigation, and ended in a final judgment being filed in the trial court that eliminated further litigation between them as to the issues in the Prior Litigation. On the other hand, Wells and PCI were not parties to that Prior Litigation, and there was no pending legal action to settle between Wells/PCI and BWR. Although the terms of the MOI between BWR and Wells/PCI were related to the Prior Litigation, what the two parties actually entered into was a separate contract that would provide certain benefits to each other in return for agreed upon forbearances: Wells/PCI would be permitted to continue to have the benefit of Haag's employment, and BWR would be protected from unfair competition due to that employment, and to potentially obtain some benefit from being designated as a preferred supplier. This agreement was merely a contract between BWR and Wells/PCI; there was no intention of formalizing it as a judgment of the trial court, and, as evidenced by the current action, it certainly did not prevent further litigation between the parties. As such, any special cautions that might be applicable to "settlement agreements" are not really pertinent to the portions of the MOI that constituted the agreement between Wells/PCI and BWR.

*Oglebay Norton Co.,* 52 Ohio St.3d at 236. "The actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon." *Oglebay* at 236 (citations omitted.) Therefore, a trial court must consider whether the parties manifested a sufficiently definite intention to be bound such that an agreement would be specifically enforceable, or whether they merely negotiated toward a formal contract without ever reaching it. *Id. See, also*, *Brotherwood v. Gonzalez,* 3d Dist. No. 10-06-33, 2007-Ohio-3340.

{¶29} Our appellate review of a decision on the existence of a contract raises a "mixed question of fact and law." *Hickman v. Cole*, 3d Dist. No. 5-98-30, 1999 WL 254379 (Apr. 7, 1999). "We accept the facts found by the trial court on some competent, credible evidence, but freely review application of the law to the facts. A reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use their observations in weighing credibility of the proffered testimony." *Cramer v. Bucher*, 3d Dist. No. 5-02-01, 2002-Ohio-3397, ¶ 9, quoting, *McSweeney v. Jackson*, 117 Ohio App.3d 623, 632, 691 N.E.2d 303 (4th Dist.1996).

{¶30} Wells/PCI does not dispute the trial court's finding that the terms in "most of the Memorandum of Intent are not in dispute." (J.E., p. 2) The sole area

of dispute deals with the preparation and "acceptance" of a customer list.[3]

Wells/PCI contends that since a customer list has never been agreed upon, there

was no settlement agreement. BWR, on the other hand, contends that Wells/PCI

has refused to act in good faith in agreement on a customer list. The paragraph in

the MOI that is in dispute states:

> 2. Wells/PCI agrees that it will not compete/solicit/interfere with a list of existing customers of B. W. Rogers who are involved in the distribution and/or panel business (the intent of this provision will not prevent Wells/PCI from performing non-competitive business.) Said provision does not limit Wells from providing panel business to Peerless and Stolle. B.W. Rogers will provide a list to Wells/Haag for an agreement of said customers, subject to reasonable confidentiality protection. (*See* Exhibit 1)

{¶31} Within this paragraph, the particular area of dispute involves the

meaning, or the intention of the parties, regarding the phrase stating that BWR

would "provide a list to Wells/Haag "*for an agreement* of said customers * * *."

BWR claims that the phrase "for an agreement" merely provided Wells/PCI with

the right to review the list to ensure that the list was truly a list of BWR's actual

customers, and to verify that Stolle and Peerless (and their subsidiaries/divisions)

were not included on the list. Wells/PCI claimed that the terminology meant that

it had to agree upon the customers that would be included on the list because

Wells/PCI was not going to blindly exclude existing customers with which they

---

[3] There was also some disagreement as to the start date of the parties' agreement, whether it started upon the signing of the MOI on October 9, 2009, or whether it would begin upon the signing of a finalized formal agreement. This matter was settled by the trial court. *See* discussion of Fourth Assignment of Error.

had worked to build a business relationship with. (Tr., pp. 206-207) Wells/PCI's interpretation has the effect of giving Wells/PCI the right to edit the list to exclude any of BWR's customers that it wished to continue to maintain as a customer, in addition to Peerless and Stolle.

**{¶32}** The trial court found that the evidence was clear that the parties negotiated and intended to enter into an agreement upon the signing of the MOI. (J.E., p. 4) The fact that they had prepared a written agreement that was formally signed by all of the respective parties was evidence that these were not merely "negotiations," but a formalized agreement evidencing their intent to enter into a binding contract.

**{¶33}** Even more telling, the trial court found that the parties' conduct subsequent to the settlement negotiations also supported the court's finding that the parties believed they had entered into an agreement. *See, Oglebay*, *supra.* BWR acted upon the agreement and essentially performed all of its obligations: it dismissed the lawsuit against Haag, allowing him to continue to work for Wells/PCI; it settled the matter of the non-compete payment with Haag; and, it provided Wells/PCI a list of its distributorship products and its proprietary customer list.

**{¶34}** BWR's attorney also drafted an "Agreement," dated 10/23/2009, that it sent to Wells/PCI. This Agreement was basically a "formalized" version of the

MOI. It included the terms that were agreed upon in the MOI, but put them into official contract format, with section headings, numbered subparagraphs, and introductory recitals. However, other than the more formalized and detailed language and format, this typed Agreement closely followed the terms of the original handwritten MOI. (Ex. 3)

{¶35} On November 17, 2009, Wells/PCI's attorney, made some modifications to BWR's draft and sent the revised Agreement back to BWR, with a summary of the changes it had made. What is significant about this second draft is that, even though Wells/PCI made multiple modifications affecting almost every paragraph of BWR's draft, most of the changes were minor modifications of wording and did not change the basic terms or the meaning of the original MOI in any significant way. (Ex. 3) Wells/PCI's proposed wording for the "Restrictive Covenant" section, encompassing the agreement set forth in paragraph 2 of the MOI, stated:

> 1.1 *Wells and Panel Control agree that they shall not engage in or become interested in or connected with any business or venture that engages in any direct or indirect activities that compete with BWR only as it relates to its existing customers in the distribution and/or panel building business.* Conversely, Wells and Panel Control shall be permitted to engage in or become interested in or connected with any business or venture, even existing customers of BWR, as long as such business does not engage in the distribution and/or panel building business. BWR's existing customers are set forth in the list attached hereto as Exhibit A.

> 1.2    Wells and Panel Control (including their agents and employees) agree that they shall not solicit, entice, influence, interfere with or attempt to solicit, entice, influence, or interfere with BWR's existing customers in the distribution and/or panel building business of those companies, identified in Exhibit A, or the agents of such customers.
>
> 1.3    Paragraphs 1.1 and 1.2 do not prohibit Wells and Panel Control from engaging in any business with Peerless Machinery Corp. and Stolle Machinery LLC including, but not necessarily limited to, panel business.

(Emphasis added.  *See,* Ex. 3)

**{¶36}** More than five weeks after the parties negotiated and signed the original MOI, Wells/PCI was still proposing language that embodied the essential agreement set forth in paragraph 2 of the MOI, namely that "Wells/PCI agrees that it will not compete/solicit/interfere with a list of existing customers of B. W. Rogers who are involved in the distribution and/or panel business * * *." Nowhere in any of the subsequent proposed drafts did Wells/PCI suggest that it had the right to agree to, affirm, edit, modify, approve of, carve out, or eliminate any companies from BWR's list of "existing customers" who were involved in the "distribution and/or panel business."  Peerless and Stolle remained the only two BWR customers in the distribution and/or panel business that were not to be excluded from competition by Wells/PCI, as originally agreed.

**{¶37}** The testimony and emails that were admitted at trial evidencing the communications between the attorneys indicated that sometime in late December

2009, Wells/PCI started to request separate customer lists for the panel and distribution customers, and wanted to limit the list to a smaller geographic area. BWR replied that such a request was not in keeping with the terms of the original MOI, but that it would comply in order to "reach a compromise." (Ex. 7, email dated 12/30/09) In a January 15, 2010 email, BWR's attorney indicated that it would continue to modify its list in order to try to reach a compromise on an issue that "was clearly resolved by the plain language of the Memorandum of Intent." (Ex. 8) BWR stated its intention to continue to proceed with filing the consent decree and to comply with the other terms required of it by the MOI. (*Id.*) Although still trying to work out their issues, by March of 2010, there was increased animosity with the threats of litigation.

{¶38} In a March 26, 2010 letter to BWR, Wells/PCI's attorney stated that it believed that, if litigated, they would be able "to prove that your client's list of 'existing' panel building customers is still greatly inflated * * *" and that the list contains customers "to which we believe BWR has no such relationship." (Ex. 11) Therefore, even more than five months after the MOI, the parties were still in agreement as to the essential terms as stated by BWR, i.e., BWR would provide its customer list, and Wells/PCI would have the right to verify that the companies on the list were truly current customers of BWR. Wells/PCI was merely contesting whether BWR's customer list complied with the requirements in the MOI.

{¶39} The parties' actions after signing the MOI are in keeping with the findings of the trial court as to the meaning of the parties' original agreement:

The paragraph [2] unambiguously sets forth that [Wells/PCI] agreed to not compete with a list of existing customers of [BWR] in the "distribution and/or panel business." The sole issue "for agreement" should be whether the customers on the list provided are "existing" customers. If they are, the list should be agreed upon. If there is a dispute as to whether a particular customer is an "existing customer" then that issue might be a legitimate disagreement, which, if unresolved by the parties, might become an issue for the Court. (J.E., pp. 4-5)

{¶40} The trial court then found that all of the *essential elements* of the contract had been agreed upon in the MOI, the parties had taken steps in reliance upon that agreement, and the only dispute could be whether a particular customer on a list to be provided by BWR was in fact an existing customer. These findings were factually in contrast to the cases relied upon by Wells/PCI, such as *Brotherwood v. Gonzalez*, supra, and others, where there were often numerous essential elements that were unresolved, or the preliminary agreement made it clear that the parties had not yet reached a final agreement. Based on the facts before it, the trial court in this case found that there was an existing, enforceable agreement between the parties upon the completion and execution of the MOI. (J.E., p. 6)

{¶41} Finally, we acknowledge that there was one other less significant area of disagreement between the parties as to what should be the starting date of

terms of their agreement. In the exchange of drafts/discussions between the parties, BWR proposed that the start date should be the date when the parties executed the finalized *formal* Agreement. However, Wells/PCI consistently advocated that "the terms of Paragraph 2 shall continue for two years from October 9, 2009." (Ex. 3, Wells/PCI's 11/17/09 modifications to BWR's draft) This provided further support demonstrating that Wells/PCI believed the agreement between the parties was reached on October 9, 2009, when the MOI was executed.

{¶42} The record clearly supports the factual findings of the trial court, and we also find that the trial court correctly applied the basic tenants of contract law to the facts and circumstances in this case. Wells/PCI's second assignment of error is overruled.

*Third Assignment of Error – Trial Court's "Filling in the Gaps"*

{¶43} After finding that a contract existed between Wells/PCI and BWR, the trial court attempted to settle the parties' disputed interpretation of the language used in Paragraph 2 pertaining to the customer list. In the third assignment of error, Wells/PCI complains that in interpreting the disputed portion of the MOI and "filling in the gaps," the trial court was erroneously "making a contract" for the parties that did not comport with the intentions of the parties. Wells/PCI argues that the trial court's authority was not unlimited and that its

judgment did not achieve a fair and just result. Wells/PCI specifically objects as to the trial court's rejection of Wells/PCI's proclaimed interpretation of what customers should and should not be included on the customer list.

{¶44} The cardinal purpose of contract construction is to discover and give effect to the parties' intent. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898. Generally, contracts should be construed in a manner to give effect to the intentions of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923 (1989); *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374, (1974) at paragraph one of the syllabus. When the terms included in an existing contract are clear and unambiguous, a court cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146, 150 (1978).

{¶45} However, the language of a contract is not ambiguous if it can be given a definite legal meaning. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003–Ohio–5849, 797 N.E.2d 1256, ¶ 11; *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 3d Dist. No. 1-10-81, 2011-Ohio-4466, ¶ 19. The lack of a specific definition for an ascertainable contract term does not negate the parties' intention to form a contract at that time and it does not invalidate the contract.

*Owusu* at ¶ 17. "If it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result." *Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St.3d at 236-37, quoting *Litsinger Sign Co. v. American Sign Co.*, 11 Ohio St.2d 1, 14, 227 N.E.2d 609 (1967).

**{¶46}** As discussed above concerning the second assignment of error, the primary area of contention between the parties involved a disagreement over the customer list that BWR was to provide to Wells/PCI. The trial court determined that a valid enforceable contract existed. Although the MOI contemplated a future agreement to be reached between the parties as to the customer list, the MOI (as well as the parties' later renditions of the draft agreements) clearly specified the terms as to what was to be included in the customer list. Therefore, although that particular part of the agreement was not finalized, the composition of the customer list was easily ascertainable by the objective criteria set forth in the MOI.

**{¶47}** The trial court found that evidence presented at the trial was that BWR defined "existing customers" as customers making purchases within three years. No evidence contradicting that definition was submitted to the trial court. (J.E., p. 5) Therefore, the trial court held that BWR, pursuant to the agreement, was to submit a list of existing customers to Wells/PCI for Wells/PCI to confirm that the list was in fact a list of existing customers in panel/distribution. (J.E., p.

6) "Existing customers" was defined as those customers making purchases from Rogers within three years of the preparation of the list. (*Id.*)

{¶48} The trial court had the authority pursuant to Ohio contract law to fill in the gaps of the MOI after it determined that the parties intended to enter into a binding agreement. The trial court gave the parties instructions as to how they were to arrive at a customer list, utilizing the criteria set forth in the language of the MOI that had been mutually agreed upon by the parties. We find that the trial court's results as to "filling in the gaps" were fair and just and expressed the intent of the parties as stated in the MOI. The third assignment of error is overruled.

*Fourth Assignment of Error – Applied Erroneous Terms/Expiration*

{¶49} In the final assignment of error, Wells/PCI takes exception to the trial court setting the date for the agreement to run commencing from the date of the judgment entry, June 3, 2011, and running for two years from that time. Wells/PCI asserts that the trial court should have enforced the MOI according to its originally stated terms, with its terms starting from the date of the signing of the MOI, October 9, 2009 through October 9, 2011. Wells/PCI claims that the trial court has unfairly extended the expiration date of the terms of the restrictive covenant.

{¶50} The testimony at trial demonstrated that the parties had originally expected that the finalized agreement would be signed shortly after the MOI was

executed. No one contemplated, and no provisions were made for, a delay of almost two years before the issues would be settled.

**{¶51}** At the conclusion of BWR's case-in-chief, Wells/PCI moved for a directed verdict as to Count II of the complaint (the monetary damages for breach). The argument before the court was as follows:

> Atty. Zweizig [representing Wells/PCI]: The testimony by both of the witnesses presented by [BWR] this morning has indicated that *the clock has not run yet with respect to Provisions 2 and Provisions 4 of the Memorandum of Intent.* Count II of [BWR's] complaint focuses upon damages attributable to any breach of Provisions 2 or 4 of the Memorandum of Intent.
>
> In light of the testimony that, in fact, *those provisions have not begun to commence,* and on top of that, the fact that zero evidence has been presented before this court with respect to the issue of damages, I'd submit that a directed verdict as to Count II of [BWR's] complaint is appropriate.
>
> The Court:    Mr. Wallace?
>
> Atty. Wallace [representing BWR]: Yes, we proceeded on Count I, Your Honor. *Without having the enforceable agreement, there's just no way to proceed on the damages part.* * * *

(Emphasis added) (Tr. pp. 149-150). BWR then withdrew Count II.

**{¶52}** The trial court found that BWR had not yet received the benefits it had negotiated for in the MOI, and ordered the term of the agreement to commence with the filing of the judgment entry. The record from the trial clearly supports this finding. The trial court did not err when it chose dates for the

enforcement of the agreement in order to allow BWR to obtain the benefits it had bargained for.  Wells/PCI's fourth assignment of error is overruled.

{¶53} Having found no error prejudicial to the Appellants herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**