[Cite as *Huntington v. Greer*, 2016-Ohio-5100.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### UNION COUNTY

THE HUNTINGTON NATIONAL BANK,

    PLAINTIFF-APPELLANT/
    CROSS-APPELLEE,             CASE NO.  14-15-26

    v.

SHAWN M. GREER,

    DEFENDANT-APPELLEE/
    CROSS-APPELLANT,          O P I N I O N
    -and-

KELLY C. GREER, ET AL.,

    DEFENDANTS-APPELLEES.

Appeal from Union County Common Pleas Court
Trial Court No. 2013CV0118

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   July 25, 2016

APPEARANCES:

    *Jessica L. Sanderson* for Appellant/Cross-Appellee

    *Samir B. Dahman*  for Appellee/Cross-Appellant

**SHAW, P.J.**

{¶1} Plaintiff-appellant/cross-appellee, Huntington National Bank ("Huntington"), brings this appeal from the September 11, 2015 judgment of the Union County Common Pleas Court. On appeal, Huntington argues that the trial court erred by: 1) finding that Defendant-appellee/cross-appellant, Shaun Greer ("Greer"), substantially performed under the terms of the parties' settlement agreement; 2) finding that Huntington breached the settlement agreement; 3) awarding Greer attorney's fees for Huntington's breach of the settlement agreement; 4) failing to grant Huntington's claim that Greer "breached" the promissory note; and 5) failing to grant Huntington's claims for foreclosure. On his cross-appeal, Greer argues that the trial court erred by not awarding him lost profits he claims were a direct result of Huntington's breach of the settlement agreement.

## I. Relevant Facts and Procedural History

{¶2} Greer is a construction manager and the owner of Velocity Construction Services, LLC, a general contractor. On June 4, 2004, Greer executed a promissory note and mortgage on residential real estate at 7875 Industrial Parkway in Plain City, Ohio. It is undisputed that the note and mortgage are held by Huntington. While Greer was the only person who signed the promissory note, his wife at the time, Kelly Greer, signed the mortgage along with

Greer. According to the record, Greer and Kelly divorced in approximately 2010.[1]

Greer then moved out of the Industrial Parkway residence; however, all indications in the record are that Kelly continued to reside there after the couple separated.[2]

### a. The Original Foreclosure Action[3]

{¶3} The record indicates that on September 20, 2010, a foreclosure action was filed against Greer, Kelly Greer, and others who may have had an interest in the Industrial Parkway residence. (Def.'s Trial Ex. F). The original foreclosure action proceeded to a final hearing, which was held on August 25, 2011, and September 22, 2011.

{¶4} At the August 25, 2011 hearing, Michael Goodare, a litigation specialist with Huntington National Bank, testified that Greer's account went into default in March of 2010. (Doc. 73, Ex. A); (Def.'s Trial Ex. A). Goodare testified that Greer had the opportunity to cure the default by paying $6,032.84 by June 6, 2010, but he did not. Goodare did testify that Greer made a payment on

---

[1] The record does not provide a precise date for Greer and Kelly's divorce. However, in Greer's deposition on March 17, 2014, he testified that the divorce was "probably" four years prior, thus we place it approximately in 2010. (Greer Depo. Tr. at 14). Greer testified in his deposition that he and Kelly were married in 2002.

[2] We note that in the second sentence of Huntington's brief, Huntington makes the statement that "Greer has been living in his home mortgage-free for years." (Appt.'s Br. at 1). This is factually inaccurate. There is no indication in the record that Greer resided at the Industrial Parkway residence at any time during these proceedings. According to the record, Greer's ex-wife Kelly has been residing at the residence. In fact, *all* of Huntington's filings list Kelly's address as the Industrial Parkway residence and list Greer's address elsewhere.

[3] We do not have the case file from the original foreclosure action; however, multiple documents from that foreclosure action have been included in our record during the extensive litigation in this case, therefore we are able to accurately represent them.

August 31, 2010, in the amount of $6,893.37, but it was too late and was returned to Greer. Goodare testified that the reinstatement amount on August 31, 2010—when Greer made his payment—would have been "[a]bout 8,230 roughly." (Def.'s Trial Ex. A at p. 13). Goodare testified that at the time of the hearing Greer's account was in default, and that the amount due at the time of the hearing was $170,446.77. On cross-examination, Goodare testified that Huntington originally accepted Greer's August 2010 payment, provided a receipt for it, but later returned it.

{¶5} Brittany Greer, Greer's new wife, then testified at the August 25, 2011 hearing. Brittany testified that in August of 2010 she was Greer's assistant at Velocity Construction Services. Brittany testified that on August 27, 2010, she presented a check to the teller at "the Avery Branch" of Huntington. (Def.'s Trial Ex. A at p. 21). Brittany testified that Greer had originally put a check into a night deposit box for the amount he believed he owed, then he received a message stating that the amount was not correct, that it was "a dollar and change, some minor amount off." (*Id.*) Brittany testified that Greer then sent her with a new check to the bank. Brittany testified that the teller read the amount Greer was required to pay to her, that Brittany then wrote it into the check, and presented it to the teller. Brittany testified that the teller accepted the check and gave her a receipt. (*Id.* at 22-23).

{¶6} The hearing was continued to September 22, 2011. On the second day of the hearing, the parties indicated that they had "come to a verbal agreement to settle the case." (Def.'s Trial Ex. B at p. 4). The court then requested that the "material terms" be placed on the record. (*Id.*) The terms that were placed on the record included that Greer would pay a reinstatement amount of $23,148.32 in "collected certified funds" within 45 days, that Greer would be obligated to make continuing monthly payments, that Huntington would "delete the trade line to the credit reporting agencies, which would include late notices and foreclosure notices[,]" that a new coupon book would be provided for the payment amount of $1,116.85 per month, and that the parties would enter into an agreed judgment entry and release all claims. (*Id.* at 4-5). The agreement was supposed to be reduced to writing by Huntington within two weeks of the final hearing.

{¶7} A journal entry was then filed in the first foreclosure action on January 11, 2012, which stated that Greer had filed a motion to dismiss or, in the alternative, to enforce the oral settlement agreement. In its entry the court stated that the settlement agreement had been announced on the record but no journal entry "effecting that agreement has been submitted to the [c]ourt for journalization as represented by the parties. According to [Greer], this is a result of [Huntington's] unwillingness to adhere to the terms of the agreement."[4] (Def.'s

---

[4] In Greer's answer and counterclaim in the current action, Greer asserts that the "[c]ounsel for Huntington insisted that the Agreed Entry contain language that simply made no sense and, more importantly, language

Trial Ex. C). The court's entry then stated that the agreement of the parties as stated on the record on September 22, 2011, was approved and adopted as the order of the court. The court stated that Greer would prepare a journal entry incorporating the decision of the court and submit it to opposing counsel. The court further stated that the opposing party would have 14 days to approve or reject the entry, that if the opposing party failed to take any action, the preparer could present the entry for journalizing by certifying that the entry had been submitted and no response was made, and that if the entry was not presented to the court within 45 days, the case would be dismissed for want of prosecution.

{¶8} On February 27, 2012, the trial court filed a judgment entry dismissing the original foreclosure action, stating that "the [c]ourt notified [Huntington] that this case would be dismissed without prejudice if [Huntington] did not comply with its Order of said date within the time proscribed." (Def.'s Trial Ex. G). The court determined that Huntington had been properly served and had taken no action to comply with the order. Therefore the trial court dismissed the original foreclosure action without prejudice.

### b. The Written Settlement Agreement

{¶9} Despite the fact that the trial court had dismissed the original foreclosure action, the parties executed a document titled "Settlement Agreement

that Greer could not legally agree upon" such as Greer agreeing to "grant judgment against his x-wife [sic] Kelly Greer, the Union County Treasurer or anyone else, besides himself." (Doc. No. 54).

and Mutual Release of All Claims" on April 27, 2012. The settlement agreement

reads,

> **This Mutual Settlement Agreement and Release of all claims is entered into * * * by [Huntington] and [Greer].**
>
> **WHEREAS, [Huntington] filed a foreclosure action against Defendants Shaun Greer and Kelly Greer ("Greers") in Union County Court of Common Pleas, Case No. 10-CV-0479 (the "Lawsuit") for default on a promissory note from Greer to Huntington dated June 4, 2004, in the amount of $162,000.00 (the "Note"), which was secured by an Open End Mortgage (the "Mortgage") executed by Shaun Greer and Kelly Greer. Shaun Greer filed an answer disputing the amounts owed under the Note and Mortgage;**
>
> **WHEREAS, the parties have decided to resolve all issues between them according to this Settlement agreement and Mutual Release of all Claims ("Agreement").**
>
> **NOW, THEREFORE, in consideration of the foregoing mutual recitals, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:**
>
> 1. **Shaun Greer will pay to Huntington the amount of $23,147.15 within 30 days of the execution of this agreement by certified check or cashier's check. This amount will be credited to the Promissory Note pursuant to a standard amortization schedule. The terms and conditions of the Promissory Note and Mortgage will remain the same as they were prior to the Lawsuit, and Shaun Greer agrees to pay all payments required by the Note and Mortgage as modified herein.**
>
> 2. **Shaun Greer will be obligated to, and will pay, the regularly schedule Note and Mortgage payments for April, 2012, and May, 2012. Huntington agrees to accept Shaun Greer's Mortgage payments for February, 2012, and March, 2012, on the date that the May, 2012 payment is due. Shaun**

Greer acknowledges that the February 2012, payment and the March, 2012, payment have not been paid as of the date of this Agreement. The amount of the Mortgage payment will be $1,116.85.

3. Within one week after receipt of the payment described in Paragraph one above, Huntington will request that all three credit agencies update their records relative to this loan and that the agencies remove all records that indicate payments were late and all records that reflect that the loan is or was in foreclosure. Additionally, Huntington agrees that it will not report any further negative credit information whatsoever to any credit agency relative to the Note and Mortgage after the date of this Agreement provided that Shaun Greer complies with this Agreement. Huntington will send to Shaun Greer a letter confirming the date on which Huntington requested that all three credit reporting agencies remove all records that indicate that payments were late and all records that reflect that the loan is or was in foreclosure. Huntington will not be liable for any failure of the credit reporting agencies to act in accordance with these requests. Any public records reference may not be updated and Huntington makes no representation relating thereto.

4. Within two weeks of the date that this Agreement is executed, Huntington will provide Shaun Greer with a payment coupon book that accurately reflects the remaining payments.

5. If Shaun Greer fails to make the $23,147.15 payment required in Paragraph 1 or the payments set forth in Paragraph 2, Huntington will have the right to enter the attached Agreed Judgment Entry and Decree in Foreclosure and go forward with the sale of the property in this matter.

6. Upon the signing of this Agreement, the parties agree that this matter has been resolved and that the trial of this matter will not go forward. The lawsuit will remain

**pending and open on the Court's docket for 45 days to allow Shaun Greer and Huntington to perform according to this Agreement.**

7. **In consideration on the terms contained herein, the parties do hereby fully and unconditionally release and/or forever discharge each other and their respective agents \* \* \* of and from all damage, loss, claims, demands, liabilities, obligations, actions and causes of action whatsoever which one party may now have, or claim to have, against the other party as of the date of this Agreement, whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way affecting, concerning, arising out of or founded upon the facts plead in the Lawsuit[.] \* \* \* Notwithstanding the terms of the Release, Plaintiff is not releasing any claim it may have against Greers unrelated to the Lawsuit.**

8. **This agreement is binding upon the parties' successors and assigns.**

9. **The parties acknowledge that this Agreement is a settlement of a disputed matter and that nothing contained herein is meant to be an admission of liability by one party to the other.**

{¶10} The agreement was signed by both parties and was notarized.[5] It was never successfully implemented.

### c. The Current Action

{¶11} On April 19, 2013, Huntington filed a "Complaint for Money and Foreclosure" listing Greer, Kelly Greer, Jane Doe unknown spouse of Greer,[6] John

---

[5] The agreement was signed by "Mike Goodare" on behalf of Huntington. Goodare was the litigation specialist employed by Huntington who testified at the final hearing on the first foreclosure action.

Doe unknown spouse of Kelly Greer, and the Union County Treasurer as defendants. (Doc. No. 2). The complaint alleged that Greer had defaulted on his Promissory Note. The complaint further alleged that Kelly Greer, and the other defendants, had or may claim to have an ownership interest in the property. The complaint also alleged that Greer breached the settlement agreement, that Huntington was entitled to damages from Greer's breach, and that Huntington should be awarded attorney's fees and costs for the breach.

{¶12} Greer filed an answer denying Huntington's claims and asserting multiple counterclaims. In his counterclaims Greer alleged that Huntington breached the settlement agreement, that Huntington breached its duty of care to Greer by negligently refusing to accept payments he tendered, and that Huntington breached its duty of good faith and fair dealing arising out of the agreements between the parties. Greer alleged in excess of $25,000 in damages for each of his claims and he also requested that he be awarded attorney's fees.

{¶13} The only defendant other than Greer to file an answer was the Union County Treasurer, which requested that "in the event of any sale of the real estate, * * * the interests of the Union County Treasurer be preserved and that all real estate taxes, including any interest and penalties, be paid." (Doc. No. 13).

---

[6] We note that despite the fact that Brittany Greer is so plainly listed in the record in multiple locations as Greer's wife at the time of these proceedings, Huntington never amended its complaint from "Jane Doe" to Brittany Greer.

{¶14} On May 30, 2013, a "Supplemental Preliminary Judicial Report" was filed indicating that Kelly Greer had given a quitclaim deed to Greer and that the deed was recorded on June 15, 2012.[7] (Doc. No. 25).

{¶15} The case then proceeded through discovery and motion practice. Huntington filed a motion to dismiss Greer's counterclaim and a motion for summary judgment, both of which were opposed, and ultimately overruled. The parties also proceeded unsuccessfully through mediation.

{¶16} During discovery multiple depositions were taken in an attempt, in part, to clarify the lost profits/damages Greer was claiming as a result of Huntington's purported breach of the settlement agreement when Huntington refused to accept his payment. Johnny Hunter was deposed on March 22, 2014.[8] In his deposition Hunter testified that he was chairman of the board of the 2012 Hunter Development Project. While litigation was pending, Hunter had written two letters to Greer/his attorney regarding construction projects that Greer had originally been awarded. The first letter indicated that Greer had been "chosen" as "Construction Manager as Advisor" for the 2012 Hunter Development Project in Warren Michigan. (Def.'s Trial Ex. S). The project was "bid out" for $9,890,723 and Greer was to be awarded a 6% fee on that total contract sum. (*Id.*) The first

---

[7] We note that the preliminary judicial report indicates that the original mortgage loan was in the amount of $162,000.00, which contradicts later testimony, indicating that the amount was actually $182,000.00

[8] Huntington initially argued that Hunter's deposition should not have been considered by the trial court for a variety of reasons. The magistrate did not consider Hunter's deposition and Greer objected. The trial court sustained Greer's objection and found that it could consider Hunter's deposition. Huntington does not appeal the trial court's decision on this matter.

letter stated that "[u]pon awarding this project to Mr. Greer as the construction manager as advisor, the board of the development group * * * found out that he had a sudden fore-closure [sic] on his personal property. This concerned the board greatly and they decided that they needed to go to the next highest bidder." (*Id.*) Hunter wrote a second letter related to "Phase II" of the same project, which stated that, "The bids for Phase II of the project were due January 10th, 2014. The board has decided to graciously extend their bidding period for role of the Construction Manager as Advisor to January 31, 2014, allowing Mr. Greer to rectify this issue with the foreclosure by Huntington Bank on his credit report." (*Id.*)

{¶17} In his deposition, Hunter testified that because of Greer's foreclosure, the project could not go forward with Greer despite the fact that Greer had won the bids for the projects. Hunter testified that absent the foreclosure proceedings the project definitively would have hired Greer as its construction manager. Hunter testified they were also looking at Greer, through his company Velocity, to manage multiple other projects as well, including a $19 million mall project, but the foreclosure prevented his hiring.[9]

{¶18} On April 10, 2014, the case proceeded to a hearing on the merits before a magistrate. At the hearing Huntington first called Shelley Hibburt-

---

[9] In addition to Hunter's deposition, Greer was also deposed, as was a man named Slavisa Milenkovic, who testified that he was self-employed with Teemok construction. Milenkovic testified that he did work with Greer's construction business Velocity. Milenkovic testified that Greer's foreclosure impacted him because contractors did not want to work with Greer.

Gomulinski, a litigation specialist with Huntington. Hibburt-Gomulinski testified that she had worked for Huntington for just over a year and that the scope of her job, in part, was as "keeper of the records." (Apr. 10, 2014, Tr. at 21). Hibburt-Gomulinski testified that Huntington was the holder by assignment of a note and mortgage wherein Greer was identified as the borrower. Hibburt-Gomulinski testified that the principal paid out by Huntington was $182,000.[10] (*Id*. at 24).

{¶19} Hibburt-Gomulinski testified that Greer did not remain current on his payments. Hibburt-Gomulinski testified that to "become current" at the time of the hearing Greer would have to pay $79,902.33. (*Id*. at 32). Hibburt-Gomulinski testified that Huntington was requesting a decree of foreclosure, and a money judgment for the balance of the loan, which with late fees was $234,524.25.

{¶20} Hibburt-Gomulinski also testified that Huntington and Greer had reached a settlement agreement in the original foreclosure action, though she testified that she did not work for Huntington at the time the agreement was made. Hibburt-Gomulinski testified that she had no personal knowledge as to Greer ever attempting to pay Huntington pursuant to the settlement agreement. Hibburt-Gomulinski testified that Huntington's records similarly did not contain any such information.

---

[10] Hibburt-Gomulinski's testimony that the original amount was $182,000 is contradicted by other indications in the record, including the settlement agreement itself, that the original amount was $162,000.

{¶21} Huntington then called Greer as on cross-examination. Greer admitted that he signed the note and mortgage in question, and that a settlement had been reached with Huntington in the first foreclosure action. Greer testified that the settlement agreement was eventually reduced to writing and that the first provision required him to pay $23,147.15 within 30 days of signing the agreement by certified check or cashier's check. Greer testified that while he did try to pay Huntington, it was not by certified funds.

{¶22} Huntington then rested its case and Greer presented his case-in-chief, beginning by testifying as on direct. Greer testified that in the construction business credit scores were important because he needed "bonding" when he did public jobs. (Apr. 10, 2014, Tr. at 64). Greer testified that if a person had good credit, he could receive bonding. Greer testified that prior to the first foreclosure action, he had "decent" credit, which according to his testimony, and some exhibits he produced, was approximately 100 points higher. (*Id.*) Greer testified that prior to the foreclosure action he was able to obtain bonding for projects as large as $60,000,000, but since the foreclosure he could get bonding for "200,000 maybe." (*Id.* at 68).

{¶23} As to how the residence in question fell into foreclosure, Greer testified that in 2010, "[m]y ex-wife and I were getting divorced. And she stayed in the house. And I thought that she was going to pay for the house; [she] thought

I was going to pay for the house. It got mixed up." (*Id*. at 68). Greer testified that he tried to correct the deficiency prior to the first foreclosure and sent his assistant, now his wife, in with a check to Huntington. However, Greer testified that the first foreclosure proceeded and the parties eventually reached a settlement agreement. Greer testified that prior to paying the lump-sum under the settlement agreement, he had received an email instructing him to pay by "check." Greer testified that he went to Huntington and attempted to pay by personal check, but his payment was rejected. Specifically, on May 17, 2012, according to Greer, Greer went to Huntington's branch in Powell, Ohio, and despite the history of difficulties in this case leading to the express requirement in the settlement agreement for a certified or cashier's check, presented a *personal* check to a teller in the amount of $23,147.15. Greer stated that he brought a personal check because his attorney had sent Huntington's attorney an email requesting instructions on "how to make the $23k payment as we discussed." (Def.'s Trial Ex. E). In the email, which was contained in the record, Huntington's attorney responded, "Attached is the signature page of my client. Mr. Greer can call my client contact, Mike Goodare * * * when he is at the branch to present the $23,000.00 check." (*Id*.)

{¶24} Greer stated that he gave the teller the email and explained why he was at the Huntington branch. Greer stated that he told the teller that the check

was not going to reflect what was actually owed to make the account current but it was the result of a settlement agreement. Greer informed the teller that she could call the person listed in the email and the teller indicated that she tried but was unsuccessful. Greer stated that he spoke with the manager, who informed Greer that they did not handle legal issues there and that from their records the check did not make the account current so they could not accept the check. According to Greer, there was no indication that his payment was rejected because the check was not certified.

{¶25} Greer indicated that he then called his attorney, who attempted to get in touch with Huntington's attorney to rectify the situation. Greer stated that Huntington's attorney would not respond and that was the last correspondence that took place until Huntington filed the current action, some eleven months later. Greer also testified that per the agreement he sent a check for $3,400 to Huntington for three months of mortgage payments but Huntington returned the check because, like the lump-sum payment, it was insufficient to bring the account current.

{¶26} As to his counterclaims, Greer testified that as a result of Huntington not following through with the settlement agreement he had

> **lost millions of dollars in contracts. Had to layoff maybe 15 people. And, I mean, I can't – I can't operate and I can't meet my obligations since this is still on my credit. I, you know, when it was thrown out in January or February, that's why I was**

**trying to continue to rectify this matter so that I could move forward. And that's why, even though the – the Court dismissed it, this is why I was trying to still do it in May to rectify this matter so I could move on. Because I knew that the longer this gets drug out, the more financial burden it would have on my five children, myself, my staff, and their wives, families, husbands. * * * And I was not able to do that since I wasn't allowed to make this payment.**

(Apr. 10, 2014, Tr. at 79-80).

{¶27} Greer then testified more specifically to the jobs that he claimed he had lost because of the foreclosure. He testified regarding the Hunter Development Project, which would have earned him $593,443 in profit from Phase I, and $325,000 profit from Phase II. Greer testified that the Hunter School Project would have earned him $180,000 and the mall project would have earned Velocity, rather than him personally, $1.1 million in profit. Greer's testimony and exhibits indicated that altogether he and his company had lost $3,833,615 in potential profits due to the foreclosure action. (Def.'s Trial Ex. R).

{¶28} Greer testified that the amounts he was giving related to the projects were just the amounts he would profit, "[i]t's just from that line item." (Apr. 10, 2014, Tr. at 124). Greer testified that if there were payments to employees or costs for materials they were on "a separate line item." (*Id.*) As to the nature of his profits for the construction management jobs he was going to do personally rather than through Velocity, Greer testified that the only overhead he had was the

cost of driving to and from the work site and his room and board. Greer testified that it would cost him, based on his experience, $4-5,000. (*Id*. at 129).

{¶29} On cross-examination, and during questioning by the magistrate, Greer testified that due to timing he would not have been able to do all of the projects. He also testified that only a few projects were attributable to him personally rather than Velocity and Velocity was not a party to the lawsuit. Greer testified that the projects he had been awarded personally were the Hunter Development Project Phase I and II, and the Hunter School Project. Greer submitted exhibits indicating that some projects he had bid individually and some projects he had bid on behalf of Velocity. (Def.'s Trial Ex. Q).

{¶30} At the conclusion of Greer's testimony, Greer rested his case and the magistrate took the matter under advisement. The magistrate's decision was filed June 23, 2014. In the decision, the magistrate determined, after analyzing the law and evidence, that Greer had substantially performed under the settlement agreement when he presented his personal check for the appropriate amount and that Huntington breached the agreement by failing to accept the payment and perform as required. The magistrate thus recommended that Huntington's claims for breach of the agreement be denied. The magistrate also recommended that Huntington's foreclosure claim be denied. In addition, the magistrate did not find

Greer's remaining claims, other than Huntington's breach of the settlement agreement, to be well-taken.

**{¶31}** The magistrate then analyzed Greer's claims for damages as a result of Huntington's breach and stated that Greer could not recover for Velocity's damages as Velocity was not part of this litigation and there was no "privity of contract" between Velocity and Huntington. (Doc. No. 115). The magistrate also determined that the damages were not actually to Greer individually, but rather to Velocity. However, the magistrate stated that even assuming Greer could recover, Greer had not sufficiently established through his testimony that he would receive the actual profits claimed.

**{¶32}** Both Huntington and Greer made a number of objections to the magistrate's findings. On August 18, 2014, the trial court filed an entry independently reviewing and analyzing the parties' objections, and overruled them with a few exceptions. The trial court overruled Huntington's objections to the magistrate's findings that Huntington breached the settlement agreement and overruled Huntington's objection to the magistrate's finding that Greer did not breach the settlement agreement. The trial court also overruled Greer's objection to the magistrate's finding that Greer should not have been awarded lost profits. In doing so, the trial court determined that Greer had offered evidence of

"potential profit available to him" but he did not sufficiently establish those lost profits. (Doc. No. 126).

{¶33} The trial court did sustain some of the parties' objections. Most notably, the trial court determined that while a party cannot typically recover attorney's fees for a breach of contract, parties could recover attorney's fees for a breach of a settlement agreement. Unlike the magistrate, the trial court determined that Greer was entitled to attorney's fees for Huntington's breach of the settlement agreement and the trial court set the matter for a hearing on those fees.

{¶34} On October 28, 2014, a hearing was held on Greer's attorney's fees related specifically to his claims that Huntington breached the settlement agreement. Both of Greer's attorneys testified as to their work on this case. Then, an independent attorney provided testimony as to the reasonableness and the necessity of the fees. Ultimately the parties agreed that the fees attributable to Greer's claim for breach of settlement agreement were $119,186.50. However, Huntington continued to dispute whether Greer should be awarded his attorney's fees.

{¶35} On December 22, 2014, the trial court filed a judgment entry awarding Greer attorney's fees in the amount of $119,186.50. The trial court found "that the attorney fees and costs submitted are reasonable, and, as stipulated

by the parties, were incurred as a direct result of the breach of a settlement agreement." (Doc. No. 137).

**{¶36}** Both parties then filed a notice of appeal; however, this Court dismissed that original appeal as the trial court had not yet rendered a single final judgment making and incorporating all of its orders. *See Huntington v. Greer, et. al*, 3d Dist. Union No. 14-15-01, 2015-Ohio-3403.

**{¶37}** On September 11, 2015, the trial court filed a judgment entry consolidating all its orders into a single document. The entry ruled in favor of Greer on his breach of settlement agreement claim, but determined that Greer's remedy was limited "to an order of specific performance of the settlement and the underlying note and mortgage agreements" because Greer failed to prove he was entitled to money damages. (Doc. No. 171). The trial court thus ordered the parties to "implement the settlement agreement and * * * Huntington shall have no right to recover penalties or interest incident to its breach of the settlement agreement. Each party is ORDERED restored to *status quo ante*, as of May 17, 2012." (*Id.*) The remaining claims of Greer and Huntington were denied, with the exception that Greer was awarded attorney's fees in the total amount of $119,186.50 for Huntington's breach of the settlement agreement.

**{¶38}** It is from this judgment that both Huntington and Greer appeal, asserting the following assignments of error for our review.

*Appellant/Cross–Appellee's Assignment of Error No. I*
**THE TRIAL COURT ERRED IN FINDING GREER SUBSTANTIALLY PERFORMED HIS OBLIGATIONS UNDER THE SETTLEMENT AGREEMENT.**

*Appellant/Cross–Appellee's Assignment of Error No. II*
**THE TRIAL COURT ERRED IN FINDING THAT HUNTINGTON BREACHED THE SETTLEMENT AGREEMENT.**

*Appellant/Cross–Appellee's Assignment of Error No. III*
**THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES TO GREER WHEN THE SETTLEMENT AGREEMENT ITSELF DID NOT PROVIDE FOR PAYMENTS OF FEES AND GREER FAILED TO PERFORM.**

*Appellant/Cross–Appellee's Assignment of Error No. IV*
**THE TRIAL COURT ERRED IN NOT GRANTING HUNTINGTON JUDGMENT ON HUNTINGTON'S CLAIM FOR BREACH OF THE PROMISSORY NOTE.**

*Appellant/Cross–Appellee's Assignment of Error No. V*
**THE TRIAL COURT ERRED IN NOT GRANTING HUNTINGTON JUDGMENT ON HUNTINGTON'S CLAIM FOR FORECLOSURE.**

*Appellee/Cross–Appellant's Assignment of Error No. I*
**THE TRIAL COURT ERRED IN NOT AWARDING LOST PROFITS TO MR. GREER BECAUSE MR. GREER ESTABLISHED HIS PERSONAL LOST PROFITS WITH REASONABLE CERTAINTY.**

## II. Huntington's Assignments of Error

### a. First Assignment of Error

{¶39} In Huntington's first assignment of error, it argues that the trial court erred in determining that Greer substantially performed under the settlement

agreement when Greer presented a personal check rather than a certified check to pay the lump-sum amount under the settlement agreement. Huntington argues further that Greer's failure to make any of his payments as required by the settlement agreement "destroys the value and purpose of the [s]ettlement [a]greement." (Appt.'s Br. at 10).

**{¶40}** "A settlement agreement is a contract designed to prevent or end litigation." *Selvage v. Emnett*, 4th Dist. Scioto No. 08CA3239, 2009-Ohio-940, ¶ 10. Settlement agreements are highly favored as a means of resolving disputes. *Id*. citing *State ex rel. Wright v. Weyandt*, 50 Ohio St.2d 194, 197 (1977). To be enforceable as a binding contract, a settlement agreement requires no more formality than any other type of contract. *B.W. Rogers Co. v. Wells Bros.*, 3d Dist. Shelby No. 17-11-25, 2012-Ohio-750, ¶ 27. A settlement agreement "need not necessarily be signed, as even oral settlement agreements may be enforceable." *Id*. citing *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 2002-Ohio-2985, ¶ 15. A trial court possesses full authority to enforce a settlement agreement voluntarily entered into by the parties. *Mack v. Polson Rubber Co.*, 14 Ohio St.3d 34, 36 (1984).

**{¶41}** In this case, the parties do not dispute that a settlement agreement existed and they similarly do not dispute what was contained in the settlement

agreement. Rather, Huntington argues that the trial court erred in determining that Greer substantially performed under the settlement agreement.

**{¶42}** "As a general rule, a party does not breach a contract when that party substantially performs the terms of the contract." *Whitt Sturtevant, LLP v. NC Plaza LLC*, 10th Dist. Franklin No. 14AP-919, 2015-Ohio-3976, ¶ 29, citing *Ohio Farmers Ins. Co. v. Cochran,* 104 Ohio St. 427 (1922), paragraph two of the syllabus. Nominal, trifling, or technical departures from the terms of a contract are not sufficient to breach it. *Whitt Sturtevant*, *supra*, at ¶ 29, citing *Cleveland Neighborhood Health Serv., Inc. v. St. Clair Builders, Inc.,* 64 Ohio App.3d 639, 582 N.E.2d 640 (8th Dist.1989). Nevertheless, if a party "fails to perform an essential or 'material' element of a contract, not only can it be liable for damages, but it also excuses the plaintiff from any further performance." *Nious v. Griffin Constr., Inc.,* 10th Dist. Franklin No. 03AP–980, 2004-Ohio-4103, ¶ 16, citing, *inter alia*, *Bd. of Commrs. of Clermont Cty. v. Village of Batavia* (Feb. 26, 2001), Clermont App. No. CA2000-06-039.

**{¶43}** "The considerations in determining whether performance of a contract is substantial are those for determining whether a failure is material." 18 Ohio Jurisprudence 3d, Contracts, section 198, at 115-116 (2010); *see also In re Interstate Bakeries Corp.*, 751 F.3d 955, 962 (8th Cir.2014) ("Substantial performance and material breach are interrelated concepts[.]"). "[A] 'material

breach' of contract is a party's failure to perform an element of the contract that is 'so fundamental to the contract' that the single failure to perform 'defeats the essential purpose of the contract or makes it impossible for the other party to perform.' " *O'Brien v. Ohio State Univ.*, 10th Dist. Franklin No. 06AP-946, 2007-Ohio-4833, ¶ 56, quoting 23 Williston on Contracts, Section 63:3.

{¶44} "Ohio courts generally consider five factors in determining whether a breach is material," which have been taken from the Restatement on Contracts. *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 933 F.Supp.2d 974, 1004-05 (S.D.Ohio 2013). These factors include,

> **(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;**
>
> **(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;**
>
> **(c) the extent to which the party failing to perform * * * will suffer forfeiture;**
>
> **(d) the likelihood that the party failing to perform * * * will cure his failure, taking account of all the circumstances including any reasonable assurances;**
>
> **(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.**

Restatement of the Law 2d, Contracts, Section 241 (1981). *see also O'Brien v. Ohio State Univ.*, 10th Dist. Franklin No. 06AP-946, 2007-Ohio-4833, ¶ 60

(utilizing the Restatement factors). Furthermore, "[w]hen the facts presented in a case are undisputed, whether they constitute performance or a breach of the contract, is question of law for the court." *Luntz v. Stern*, 135 Ohio St. 225, 237 (1939); *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. Franklin No. 04AP-980, 2006-Ohio-638, ¶ 35.

{¶45} In this case the magistrate analyzed the evidence presented, which we summarized previously, and applied the testimony and exhibits to the factors in the Restatement on Contracts for considering whether Greer substantially performed. In doing so, the magistrate concluded that on balance, the factors weighed in favor of Greer having substantially performed under the settlement agreement. The magistrate was particularly persuaded by the argument that Huntington did not reject Greer's check because it was a personal check, but rather because of the amount, and the argument that the harm to Greer was "disproportionate to his failure to tender in strict compliance with the agreement." (Doc. No. 115). In addition, the magistrate noted with concern that Huntington never responded to Greer's "post-tender inquiries or otherwise provided an opportunity to cure. To be certain, the issue of form of tender was raised by Huntington only in the midst of the present lawsuit filed by Huntington." (*Id.*) The magistrate also determined that Greer tendered his performance in good faith.

**{¶46}** Huntington objected to portions of the magistrate's analysis, and while the trial court did not adopt all of the magistrate's reasoning, the trial court overruled Huntington's objections on the issue of substantial performance. In doing so, the trial court stated that, "After *de novo* review, the court FINDS the record is devoid of any evidence of harm to Huntington by the presentment of the personal check. Huntington's objections * * * are overruled." (Doc. No. 126). The trial court thus determined that Greer had substantially performed under the settlement agreement.

**{¶47}** In our own review of the trial court's decision, we emphasize initially that both the magistrate and the trial court seemed to place little value or importance on the fact that for a period of many months, and even years, following the original default on this promissory note and mortgage, these parties had experienced multiple issues and disputes regarding the making and accepting of payments, including a prior failure to implement or even to obtain journalization of this settlement agreement in the pending foreclosure action, to the point the trial court felt compelled to dismiss the entire original foreclosure action.

**{¶48}** Then, four months after that dismissal, the parties attempted to draft the current written settlement agreement, purporting to relate it directly to a foreclosure action which was no longer pending. As a result, the agreement no longer carried any immediate ability of the trial court to monitor or enforce it. In

this context and given the history between these parties, we believe it is far more reasonable to conclude that the requirement of a certified or cashier's check in the April 27, 2012 written settlement agreement was of paramount importance to Huntington in the negotiation and implementation of that agreement.

{¶49} Notably both the oral and written settlement agreements *explicitly* stated that the payment should be by certified check or cashier's check. Yet, despite the fact that both agreements so clearly called for the payment to be made in certified funds, the first act taken by Greer was to go to a branch of Huntington and present a check that was not in compliance with the agreement.[11]

{¶50} Greer claims that he presented a personal check rather than a certified check based on an email between his attorney and Huntington's attorney, which called simply for a "check." First, that email is outside of the four corners of the settlement agreement and thus has little, or potentially no, value. Second, and even more importantly perhaps, the email *predates* the date the written settlement agreement was executed by Greer. Thus any indication that a personal check was acceptable that Greer would have received in the email in March of 2012 was *directly contradicted* by the written settlement agreement itself, which Greer executed in *April* of 2012. Therefore we cannot find Greer's reliance on the

---

[11] We note that it seems questionable that the parties would not come to an agreement wherein Greer presented his check to his attorney, who would then present the check to Huntington's attorney.

email to support his reasoning for directly contradicting the explicit terms of the settlement agreement to be reasonable under the circumstances.

**{¶51}** However, the magistrate and trial court seemed to be far more concerned with the fact that Huntington purportedly rejected Greer's check based on the *amount* of the check rather than the fact that it was a personal check and not a cashier's check. The magistrate emphasized that the form of the payment was not raised by Huntington until litigation. In addition, the magistrate and the trial court relied on the fact that Huntington could not show how it was harmed by the presentment of the personal check.

**{¶52}** Notably, however, neither the magistrate nor the trial court mentioned the fact that the record is completely devoid of any information indicating that Greer had sufficient funds in his personal account to establish that his lump-sum payment would be honored. Thus, as the record stands, Greer is unable to establish, and we are unable to conclude, that his payment, which was already not in the proper form under the terms of the agreement, would have been honored. Under these circumstances, and considering the prior history of these parties, it is only speculation to conclude that Huntington would not have been harmed by the presentment of the personal check. Accordingly, we cannot find any reasonable basis in the record to conclude, as the trial court does, that

Huntington would not have been harmed by the form of the check, which was obviously a matter Huntington specifically bargained for in the agreement.

**{¶53}** Absent any evidence in the record as to the status of funds in Greer's bank account at the time he tendered his personal check in direct violation of the agreement, we simply cannot find that Greer's actions constituted substantial performance. Therefore we must respectfully disagree with the trial court's assessment of this issue and Huntington's first assignment of error is sustained.

### b. Huntington's Second Assignment of Error

**{¶54}** Huntington argues in its second assignment of error that the trial court erred by determining that Huntington breached the settlement agreement. Specifically Huntington argues that Greer actually breached the agreement by not paying in certified funds, and that Huntington's obligations under the settlement agreement were never triggered as they were contingent upon Greer performing.

**{¶55}** In the first assignment of error we determined that the trial court erred in finding that Greer substantially performed under the contract. Due to our disposition of the first assignment of error, we sustain Huntington's second assignment of error as well. Since Greer did not substantially perform under the contract, Huntington's actions in rejecting his payment were justified and Huntington's obligations to further perform were never triggered. Thus Huntington's second assignment of error is sustained.

### c. Huntington's Third Assignment of Error

**{¶56}** In Huntington's third assignment of error, Huntington argues that the trial court erred in awarding Greer attorney's fees for Huntington's breach of the settlement agreement. As we have found that Greer, and not Huntington, breached the settlement agreement, we find that the award of attorney's fees in this case to Greer was improper. Therefore Huntington's third assignment of error is sustained.

### d. Huntington's Fourth and Fifth Assignments of Error

**{¶57}** In Huntington's fourth and fifth assignments of error, it argues that the trial court erred by denying Huntington's claims that Greer "breached" the promissory note and that the trial court erred by not granting Huntington's claim for foreclosure.

**{¶58}** Originally the trial court determined that Huntington breached the settlement agreement in this case and Greer was entitled to a remedy. The trial court determined that the proper remedy was to specifically enforce the settlement agreement as the parties stood on May 17, 2012, the date Greer attempted to make a payment with his personal check.

**{¶59}** At the outset we note a number of difficulties with this remedy that would require reversal or dismissal of the appeal, even if we were inclined to affirm the trial court's remaining judgments. These difficulties stem from the fact

that the agreement itself purports to include a forty-five day supervision period of the trial court which if presently implemented would preclude the current judgment from constituting a final order.

{¶60} More importantly, without further clarification by the trial court, the April 27, 2012 agreement itself contains numerous provisions which are entirely ambiguous and which could only invite further compliance issues, particularly given the history of such between these parties. These issues include, but are not limited to, the timing and total number of Greer's February, March, April and May payments; the amount and number of the payments under the future coupon book and the extent to which the entire term and payment schedule of the loan itself is to be extended by the four years of pending difficulties since May of 2012.

{¶61} While these issues are no longer relevant to our decision, they may be relevant to the trial court in proceeding with the foreclosure on remand.

{¶62} In sum, we have determined that Greer, rather than Huntington, actually breached the settlement agreement. Thus Huntington is entitled to a remedy. In Huntington's fourth and fifth assignments of error, it argues that the trial court should have granted its foreclosure claim. We agree. Huntington affirmatively and unequivocally established that it held the note and mortgage in question and that Greer was substantially in arrears on his obligation. Thus we find that Huntington's arguments in its fourth and fifth assignments of error are

sustained and that this case should be remanded to the trial court to conduct any further proceedings related to the foreclosure as they may be necessary.

### III.  Greer's Assignment of Error

{¶63} In Greer's assignment of error, he argues that the trial court erred by determining that Greer had not established lost profits with a reasonable certainty as a result of Huntington's breach of the settlement agreement.  We have already determined that Greer, and not Huntington, breached the settlement agreement.  Thus Greer would not be entitled to any "lost profits" regardless of what he established at the final hearing on the matter.  Therefore Greer's sole assignment of error is overruled.

### IV.  Conclusion

{¶64} Having found error in all of Huntington's assignments of error, the trial court's judgment as to Huntington is reversed and this cause is remanded for further proceedings related to foreclosure matters.  Having found no error in the trial court's judgment regarding Greer's sole assignment of error, the trial court's judgment on this issue is affirmed.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**